**In The Interest Of A.D.H. and S.J.H.**

**No. 09–97–382 CV.**

Court of Appeals of Texas, Beaumont.

Submitted Oct. 7, 1998.

Decided Nov. 19, 1998.

Liz Mobley, Mobley Law Firm, Conroe, for appellant.

Elizabeth Woodward, The Woodlands, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

STOVER, Justice.

This is an appeal from an order by the trial court denying a motion to modify conservatorship filed by appellants Alvin Henley, Jr. and Doris Henley. In their February 1997 motion, Alvin and Doris, the children's paternal grandparents, sought to modify a portion of the March 1995 divorce decree naming Sheri Henley, the children's mother, and Alvin, Doris, and their son Perry Henley, the children's father, as joint managing conservators of A.D.H. and S.J.H. Under the agreed divorce decree, Sheri was appointed the primary joint managing conservator, and Alvin, Doris, and Perry were named the secondary "Co-Joint Managing Conservators." The modification suit was a bench trial at which Sheri and Perry represented themselves pro se.

The burden of proof by the movant in a motion to modify conservatorship is by a preponderance of the evidence. *See* TEX. FAM.CODE FAM.CODE ANN. § 105.005 (Vernon 1996); *Warchol v. Warchol,* 853 S.W.2d 165, 168 (Tex.App.—Beaumont 1993, no writ). An appeal from a trial court's decision to grant or deny a motion to modify involves an abuse of discretion standard. *Doyle v. Doyle,* 955 S.W.2d 478, 479 (Tex.App.—Austin 1997, no writ). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or when it acts without reference to any guiding principles. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991). Under the abuse of discretion standard, legal and factual sufficiency of the evidence, although not independent grounds for asserting error, are relevant factors in assessing whether the trial court abused its discretion. *D.R. v. J.A. R.,* 894 S.W.2d 91, 95 (Tex.App.—Fort Worth 1995, writ denied). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate justice in a similar circumstance

does not demonstrate that an abuse of discretion occurred. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). "[T]he trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Warchol v. Warchol*, 853 S.W.2d at 167–68 (quoting *Jeffers v. Wallace*, 615 S.W.2d 252, 253 (Tex.Civ.App.—Dallas 1981, no writ)). Consequently, an abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence. *Valdez v. Valdez*, 930 S.W.2d 725, 731 (Tex.App.—Houston [1st Dist.] 1996, no writ). Furthermore, an abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id.*

 There is a strong presumption under Texas law that the best interest of a child is served if a natural parent is awarded custody. *See Brook v. Brook*, 881 S.W.2d 297, 299 (Tex.1994); TEX. FAM.CODE ANN. § 153.131(a) (Vernon 1996) (formerly TEX. FAM.CODE ANN. § 14.01(b)(1)). Section 153.131(a) statutorily provides, as did its predecessor, for appointment of the parent or parents as sole managing conservator or joint managing conservators unless the court finds the appointment would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development. In *Brook*, the Texas Supreme Court held § 14.01 applied only in those situations in which a non-parent sought custody *in lieu* of a natural parent. *Brook*, 881 S.W.2d at 299. Here, the grandparents, who are already co-joint managing conservators, are not seeking custody in lieu of a natural parent. Instead, Doris and Alvin seek to modify the original decree by changing the designation of the *primary* joint managing conservator from Sheri to themselves and by changing Perry's visitation rights to eliminate the drug testing requirement.[1] Although the parental presumption is a factor to consider, it does not take precedence in the instant case

over the requirements of modification as set out in TEX. FAM.CODE ANN. § 156.202 (Vernon 1996). *See In Interest of Ferguson*, 927 S.W.2d 766, 768–69 (Tex.App.—Texarkana 1996, no writ). The test for appointment of a parent and a non-parent as joint managing conservator is still the best interest of the child. *Brook*, 881 S.W.2d at 299–300.

The Texas Family Code sets out the requirements for modifying the terms and conditions of a joint conservatorship:

> **§ 156.202. Modification of Terms and Conditions of Joint Managing Conservatorship.**
>
> The court may modify the terms and conditions of a joint conservatorship order if:
>
> (1)(A) the circumstances of the child or of one or both of the joint managing conservators have materially and substantially changed since the rendition of the order; or
>
> (B) the order has become unworkable or inappropriate under existing circumstances; and
>
> (2) a modification of the terms and conditions of the order would be a positive improvement for and in the best interest of the child.

TEX. FAM.CODE ANN. § 156.202 (Vernon 1996).

The Family Code also provides for a modification of visitation rights in § 156.301.

> **§ 156.301. Grounds for Modification of Possession and Access**
>
> The court may modify an order that sets the terms and conditions for possession of or access to a child or that prescribes the relative rights, privileges, duties, and powers of conservators if:
>
> (1) the circumstances of the child or a person affected by the order have materially and substantially changed since the date of the rendition of the order;
>
> (2) the order has become unworkable or inappropriate under existing circumstances;
>
> (3) the notice of change of a conservator's residence required by Chapter 153 was not

---

1. Under the provisions of the agreed divorce decree, Doris and Alvin were required to deny

Perry visitation unless he passed a weekly drug test.

given or there was a change in a conservator's residence to a place outside this state; or

(4) a conservator has repeatedly failed to give notice of an inability to exercise possessory rights.

TEX. FAM.CODE ANN. § 156.301 (Vernon 1996).

 We note that the record contains no findings of fact or conclusions of law. Thus, it is implied the trial court made all necessary findings of fact to support its judgment. *Thompson v. Thompson*, 827 S.W.2d 563, 567 (Tex.App.—Corpus Christi 1992, writ denied).

 In their motion to modify, appellants pleaded the following as grounds for changing the designation of the *primary* joint managing conservator: the environment of the present primary conservator had endangered the children's physical health and impaired their emotional development;[2] a change in the primary conservator would be in the best interest of the children; and the circumstances of the children or the joint managing conservators had materially and substantially changed since the entry of the order to be modified. Their motion also sought modification of possession or access to the child by claiming that the modification would be in the children's best interest and that the circumstances of the children or a person affected by the order to be modified had materially and substantially changed.

In point of error one, appellants contend the "children's condition has changed materially and substantially since the prior order."[3] To show a change in the children's condition, they primarily direct us to Sheri's lifestyle

and conduct. We look to the record for evidence on this issue.

Appellants first presented evidence from school officials concerning A.D.H.'s absences from school. In the 1996–97 school year, she was enrolled in Anderson Elementary and Hailey Elementary in the Conroe Independent School District, Porter Elementary School in Porter, Texas, and Williams Elementary School in the Magnolia Independent School District. The testimony presented by school officials covered the period from August 21, 1996, through March 17, 1997, during which time period A.D.H. was absent eleven days. Although one of these witnesses testified that early childhood education is important, she also acknowledged pre-kindergarten and kindergarten are not mandatory.

Other witnesses for appellants included Henry Trammell, his mother Claudine Trammell, his sister Teresa Trammell, and appellants themselves. Henry Trammell testified he dated and lived with Sheri from March through December 1996. He stated he saw Sheri using dope a few months prior to trial; at the time he saw the drug use, she was pregnant. In describing her drug habit, he testified that during the time he lived with her, she was "doing" cocaine on the weekend and marijuana on a daily basis most of the time. Henry admitted he too had used cocaine and pills.

Henry also recounted incidents showing Sheri's alleged tendency toward violence and erratic behavior. He declared she cut him across the chest with a screwdriver on one occasion, because he was playing music at a friend's house. On another occasion, while he was driving in Louisiana, he claimed she jerked the wheel, moving the car into the

2. This is not a ground for modification under § 156.202. It is, however, a required showing for avoidance of the presumption of the best interest of the child in § 153.131, which, as we have said, does not apply in the instant case.

3. Appellee has not filed a brief on appeal. If an *appellant* fails to file a brief on appeal, the court of appeals may dismiss the appeal for want of prosecution unless the appellant reasonably explains the failure and the appellee is not significantly injured by the appellant's failure to timely file a brief. Alternatively, the appeals court may decline to dismiss the appeal and give further

direction to the case as it considers proper. In any event, if the appellant fails to file a brief, and a brief is filed by appellee, the court of appeals may regard the appellee's brief as correctly presenting the case and may affirm the trial court's judgment upon that brief without examining the record. TEX.R.APP P. 38.8(a). There is no such rule regarding *appellee's* failure to file a brief. In our review of the case, we have considered the entire record, and we render our decision accordingly. We have not assumed appellants' brief has correctly presented the case.

lane of an oncoming eighteen wheeler, causing the truck to swerve and stop. According to Henry, drugs prompted this behavior. Sheri denied his allegations and claimed he was hitting her in the face at the time of the truck incident. In addition, she alleged that Henry lied all the time and was, in fact, a compulsive liar. He, on the other hand, claimed she was the compulsive liar. Their testimony conflicted.

Henry also testified regarding Alvin's and Doris's home environment. "The house is always clean, and they don't fight and carry on or nothing like that." From Henry's perspective, Doris and Alvin appeared to love the children and their home would be a good environment for them.

Doris Henley recounted events which affected the girls since the divorce decree in March 1995. She testified Sheri was in jail from December 1996 until the middle of February 1997 on charges of possession of marijuana and assaulting a police officer. Acknowledging the truth of that assertion, Sheri explained that she had been in jail because her probation was revoked on a resisting arrest charge because she had failed to complete community supervision. According to Sheri, the marijuana charge was dropped after a test indicated the substance was not marijuana. Sheri admitted she had "done cocaine" and had smoked marijuana on a daily basis. Although she declared at trial she no longer did so, she did not deny that she used drugs after the 1995 order.

Doris made other allegations in an effort to substantiate her claim of changed circumstances. She testified the girls had frequent illnesses—specifically urinary tract infections and bronchitis. In addition, Doris indicated Sheri moved "[p]robably seven or eight times" in 1995. Sheri also moved frequently in 1996 and, according to Doris, had at least nine to ten different addresses. Doris testified to the following moves in 1996:

1. Sheri lived with Sheri's mother and her husband in a one-bedroom travel trailer for one month.

2. Sheri and the children moved in with her brother and his girlfriend in a two-bedroom mobile home next door to Sheri's mother and lived there approximately five months.

3. The girls spent June 1996 with Doris and Alvin as part of the summer visitation.

4. At the end of June, Sheri picked the girls up and stayed a week in the travel trailer with Sheri's mother.

5. Then, Sheri and the girls moved in with Henry Trammell and his sister at Henry's mother's trailer for about a month.

6. Sheri, the girls, and Henry moved in with Sheri's brother at his trailer in Conroe for two months.

7. Next, they moved in with Sheri's sister at a housing project in The Woodlands for two weeks.

8. Sheri, Henry, and the girls then moved to Porter, Texas, for two weeks.

9. In October 1996, Sheri brought the children to be with Doris for a couple of weeks.

10. On November 4, 1996, Sheri picked up the girls from Doris's house and said she (Sheri) was moving in with her mother again in the travel trailer.

11. At the time of trial, Sheri and the children were living with Sheri's sister and her sister's fiancé.

As demonstrated by Doris's testimony, the typical pattern for Sheri and her daughters was to live for a time with a relative or friend, move on to live with another, and then return to a previous one. Although the divorce decree required Sheri to notify Doris and Alvin *in writing* of a change of address, that requirement, according to Doris, was met only one time.

Testifying about her own environment, Doris stated she and her husband had lived for sixteen years in the same three-bedroom home which was close to being paid for. Her husband was employed at two jobs. Their daughter Cynthia and her baby lived there with them. According to Doris, Sheri's girls had their own room at her house.

Living next door to Doris and Alvin was their thirty-year old son, also named Alvin. At trial, both Perry and Sheri objected to such an arrangement, because, as Doris acknowledged, the son accepted a plea bargain

in January 1996 for child molestation and was on probation. Doris claimed she never left the girls alone with her son, Alvin. Likewise, the elder Alvin testified he had never allowed the girls to be in his son's, Alvin's, care, although he did not believe his son would do anything wrong.

During her cross examination of Doris Henley, Sheri also raised the issue of Doris's alleged negative attitude and accusatory conduct toward Sheri. According to Sheri, one of her daughters told her that "Granny" (Doris) said Sheri doesn't love her, Sheri abandoned her, and Sheri does not want her. In response to Sheri's charges, Doris denied ever making such statements. Upon further questioning by Sheri, Doris acknowledged she took A.D.H. to the police when Doris thought the child was being molested by Sheri. Sheri denied the accusations and declared she took a lie detector test which proved her innocence.

Henry's sister, Teresa Trammell, also testified for appellants. Teresa was acquainted with Sheri, because Teresa and her two children, Sheri and the girls, and Henry all lived at Teresa's mother's mobile home during the summer of 1996. On direct examination, Teresa testified she saw Sheri using marijuana at least three or four times a day and free-basing cocaine. "She'd sit there and roll it [marijuana] right in front of them."

Claudine Trammell, the mother of Teresa and Henry, also testified on behalf of the appellants. She had known Doris for many years, and Doris had babysat for Claudine's grandchildren. Claudine related that Henry and Sheri, who lived together from March to November 1996, would spend weekends in her mobile home while she was out of town. This arrangement went on from August until November, when Henry and Sheri broke up. During the week days, Sheri and Henry lived with other people. Claudine's testimony reflected that when she returned from her weekend trips, the trailer was a mess. Unwashed dishes were left on the table with dried food on them. Towels were strewn about on the bathroom floor. In Claudine's opinion, "All this is detrimental to the health of the children." Claudine concluded that Henry and Sheri were using drugs, because

she (Claudine) found a plate with white powder all over it. In her opinion, the children would be in a better environment if they lived with Alvin and Doris. Such a change would be a positive improvement.

Sheri's witnesses included Perry Henley, the girls' father, Marty Abril who was living with Perry at the time of trial, and Sheri herself. Perry testified he had no problem with the girls' living with Sheri. She takes "perfectly good fine care with them. She don't do nothing in front of them." Perry confirmed that, pursuant to the divorce decree, he could only see the children if he took (and presumably passed) a drug test before each visit. However, he explained that if Sheri and his mother were on good terms with each other, Doris would sometimes let him see the girls even though he had not taken a drug test. Based on his conversations with A.D.H., Perry had the impression that "was being pressured into saying things" by Doris, and that his mother thought the girls were hers when they were not. He acknowledged he filed a 1994 police report accusing Sheri of sexually molesting the girls. He testified he did so only because his mother pressured him into doing it. He now knows the report was false because Sheri passed a lie detector test.

Marty Abril, Perry's girlfriend, disputed much of the testimony of appellants' witnesses regarding Sheri's conduct and corroborated that recounted by Sheri's witnesses. Marty testified that Sheri had moved possibly four times, not the nine to ten times alleged by Doris. Marty corroborated Perry's testimony when she testified she believed Doris and Alvin had pressured A.D.H. to make accusations against her mother. Acknowledging her friendship with Sheri, Marty spoke of several visits with her in the past two years. At the time of those visits, the house in which Sheri lived was not messy, as appellants' witnesses had testified, and Sheri's kids were clean and happy. Marty likewise disputed the drug usage alleged by appellants' witnesses. She testified she did not believe Perry used drugs, she herself did not use drugs, and she had never seen Sheri do drugs. This was in contrast to Henry Trammell, who, according to Marty, had to

have his stomach pumped for popping pills. She further testified that the son Alvin was a child molester, who sold and smoked pot. Finally, on re-direct examination, Marty reported that she had seen Sheri's children unattended at son Alvin's house (next door) while Doris and Alvin worked in their back yard.

During her testimony, Sheri stated she had gone to a psychiatrist in 1997; the doctor prescribed anti-depressants and sleeping pills for a "stress disorder." However, Sheri stated she was not taking the medicine at the time of trial, because she was pregnant with Henry's child. In Sheri's view, her stress was the result of Doris's and Alvin's conduct: they had falsely accused her of molesting her own children; they "dragged [her] back and forth to court"; the girls were yanked back and forth between homes and never knew when they would be able to return to their mother because of appellants' custody action. According to Sheri, the appellants' actions in the custody matter caused the girls to be insecure; moreover, Alvin and Doris tried to build a relationship with the girls by giving them gifts.

After reviewing the record in its entirety, and considering the guidelines set out by the Texas Family Code and case law regarding changes in conservatorship, we conclude the trial court abused its discretion in denying the motion to modify. It is undisputed that the following changes occurred between the March 1995 divorce decree and the hearing on the motion to modify.

1. At least one child began attending school since the March 1995 order.

2. There were multiple changes of residence; A.D.H. was enrolled in at least four different schools during the 1996–97 school year.

3. Sheri was pregnant with another child by Henry Trammell with whom she was no longer living.

4. In 1997 Sheri was diagnosed with a "stress disorder" by a psychiatrist who prescribed anti-depressants and sleeping pills. She was no longer taking the medication, in part because of her pregnancy.

5. Sheri was in jail for two months after her probation for resisting arrest was revoked.

We conclude the events and circumstances listed above constitute material and substantial changes which are not conducive to providing a stable home life for the children. The circumstances described herein are at cross purposes with Texas public policy stated in TEX. FAM.CODE ANN. § 153.001(a)(2) (Vernon 1996): "The public policy of this state is to ... provide a stable environment for the child."

As stated above, the evidence reveals that Doris and Alvin have a stable home life and have been living at the same location for sixteen years. They have a separate room for the girls. Alvin is employed at two jobs and can provide a living for them. According to one witness, Alvin and Doris do not fight or "carry on." The evidence demonstrates that having Alvin and Doris as primary joint conservators would be a positive improvement for the girls over their present situation and would be in their best interest.

In denying the motion to modify, the trial court did not follow guidelines established by law, and, consequently, its ruling was arbitrary and unreasonable. The evidence showing material and substantive change is clear and unrefuted. Additionally, all the credible evidence supports the contention that a change in the managing conservator is a positive improvement for the children and in their best interest. Appellant's first point of error is, therefore, sustained. Because of our disposition of point of error one, we need not address appellant's second point of error.

Having found the trial court abused its discretion in denying appellants' motion to modify, we reverse the trial court's judgment and remand the case to the trial court for a new hearing on the motion to modify conservatorship.

REVERSED AND REMANDED.

BURGESS, Justice, dissenting.

I respectfully dissent. The majority sets out very compelling reasons to grant the grandparents' motion to modify the conservatorship of these two young children. Had

the trial court done so, I would have joined in affirming such an action. However, the trial court, did not do so and that was a decision uniquely designed for trial courts. This is not a case where the evidence is so staggering that the trial court could have reached only one conclusion. *Under the evidence,* both sides were shown to have good and bad points, with the good points perhaps preponderating in favor of the grandparents.

Our job, as an appellate court, is not to simply reweigh the evidence and reverse if we would have reached a different conclusion. In custody matters, where personal observation and evaluation of the parties and their claims is so valuable, we should give great deference to the trial court's judgment. *See Doyle v. Doyle,* 955 S.W.2d 478, 481–82 (Tex.App.—Austin 1997, no writ). This discretion is wisely vested in the trial judge because he faces the parties and the witnesses, observes their demeanor, views their personalities and senses the forces and powers which motivate them. Consequently, he is in a much better position than an appellate court to assess the needs of the child and to adjudge from personal observation which arrangement will serve the best interest of the child. *Maixner v. Maixner,* 641 S.W.2d 374, 376 (Tex.App.—Dallas 1982, no writ).

In addition to the ability of the trial judge to draw inferences from his observation of the parties and witnesses, he is at liberty to take judicial notice of prior proceedings before him. *Id.* at 376–77. We can presume that the trial court, in arriving at its decision, took judicial notice of the prior proceedings, although he was not asked to do so and did not formally announce that he had done so. There certainly may have been issues in prior proceedings that influenced the trial court in reaching his decision not to grant any modification. Based upon the evidence and the respective roles of the courts, I am unable to say the trial court's denial of the motion to modify is arbitrary and unreasonable. I would affirm the judgment.