Affirmed as
Modified and Memorandum Opinion filed November 4, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-08-01154-CV



In the matter
of B.J.W.S., A CHILD



On Appeal from
the 300th District Court

Brazoria County, Texas 

Trial Court
Cause No. 43691



 

MEMORANDUM OPINION 

In this suit affecting the parent-child relationship,
Anthony, the child’s father, appearing pro se, appeals the trial court’s
order that, inter alia, (a) names Amanda, the child’s mother, the sole
managing conservator of B.J.W.S., (b) requires that Anthony’s visitation with
B.J.W.S. be supervised, (c) limits Anthony’s electronic communication with the
child, and (d) requires Anthony to pay child support based on the presumption
that he could earn minimum wage.  In total, appellant raises some seventeen
issues and various sub-issues in this appeal.  Because we conclude that the
portion of the trial court’s order concerning electronic communication is not
consistent with the statutory requirements, we modify the order to comply with
the Texas Family Code.  We otherwise affirm. 

I. 
Background

Amanda and Anthony are the parents of B.J.W.S., who
was born in January 2005.[1]  Anthony
and Amanda met over the Internet in 2002, and they began an intimate
relationship shortly after meeting. 

Anthony was earlier diagnosed with psychosis in 1995,
schizophrenia in 1997, and obsessive-compulsive disorder in 2000.  He was
involuntarily institutionalized based on these diagnoses at least twice, and on
one occasion stayed in the hospital for at least three months.  Anthony has not
taken any medication or seen a psychiatrist since 2000.  However, at the time
of trial in 2008, he was still receiving disability payments from the United States government based on his mental health disability.

Amanda filed a suit affecting the parent-child
relationship (“SAPCR”) in July 2007, seeking sole-managing conservatorship of
B.J.W.S. and financial support from Anthony for B.J.W.S.’s care.  Anthony filed
a counter-petition on August 10, seeking appointment as a joint-managing
conservator and entry of a standard possession order.  Amanda obtained a
temporary restraining order on July 20, which restrained each parent from: (a)
disturbing the peace of the child or of another party; (b) withdrawing the
child from enrollment in the school or day-care facility where the child was
enrolled; (c) hiding or secreting the child from the other party; (d) making
disparaging remarks regarding the other party or the other party’s family in
the presence or within the hearing of the child; (e) consuming alcohol within the
12 hours before or during the period of possession of or access to the child;
(f) canceling, altering, failing to pay premiums, or in any manner affecting
the level of coverage of any health insurance policy insuring the child; and
(g) removing the child from Brazoria County, Texas.

On August 2, the parties entered into a Rule 11
Agreement, agreeing to the following:

·       
Amanda was named temporary sole-managing conservator.  Anthony
was named temporary possessory conservator.

·       
Anthony was permitted possession of B.J.W.S. once a month from
9:00 a.m. to 8:00 p.m. for up to four days (no overnight visitation) with ten
days advance notice to Amanda.  Anthony was not permitted to remove the child
from Brazoria and Harris counties.  Anthony’s visitation was required to be
supervised by his mother.  

·       
Anthony was ordered to provide temporary support in the amount of
$150 per month to Amanda.  Anthony was also ordered to procure any “SSI
benefits” proper for support of the child.  Any benefits would be applied to
the child support payment.

·       
The temporary restraining order became a mutual temporary
injunction.

·       
Amanda would pay for the child’s health insurance and any
uninsured medical expenses incurred would be split 50/50 between Anthony and
Amanda.

·       
Each party was required to exchange all psychiatric or
psychological records with the other on or before September 15, 2007.

·       
The entry date for the Temporary Orders based on the Rule 11
Agreement was set for August 17, 2007.

The trial court entered
temporary orders based on the Rule 11 Agreement on August 31.  Anthony did not
appear at the hearing to enter the temporary orders (even though it was
rescheduled to accommodate him), nor did he sign them.  These orders
incorporated the items listed above.  

            Anthony did not
provide his mental health records by September 15, 2007.  The trial court
ordered Anthony three separate times to provide his mental health records for in
camera review on Amanda’s motion, but Anthony failed to provide the
records.  Ultimately, on April 23, 2008, after Anthony failed to appear at a
hearing, the trial court entered an order on Amanda’s second motion for mental
examination, which included the following findings:

1.      Anthony
. . . has confirmed that he is disabled on the basis of his mental health
status, as defined by the Social Security Administration.

2.      Anthony
. . . has continued to disregard the Court’s orders for the production of
mental health records in this cause, though order[ed] to produce the records on
three prior occasions.

.
. .

4.      The
issues concerning the mental health of Respondent, Anthony . . ., are of such
import in determining the safety, welfare and best interest of the child in
this cause that the court must enter the following order for mental health
evaluation of Anthony . . .. 

The trial court ordered
Anthony to undergo a mental examination “to determine the full extent of his
mental disability and the possible effects of this disability on the orders
regarding possession and access to the child.”  The trial court additionally
entered an Order of Enforcement in which it found Anthony in contempt and
sanctioned him for failing to comply with its previous orders regarding
production of his mental health records by (a) abating his discovery pending
compliance with all prior orders, (b) striking his pleadings, and (c) ordering
him to pay Amanda’s attorney $1,500 for attorney’s fees.  The trial court,
however, allowed Anthony to proceed on a supplemented answer with amendments
that he filed on May 7, 2008, during a pre-trial conference.

This case was tried to the bench in June 2008. 
Amanda alleged that a standard-possession order would not be in B.J.W.S.’s best
interests based on Anthony’s lengthy history of mental illness.  She again
requested that Anthony’s periods of possession be supervised and sought a
permanent injunction, which incorporated several of the provisions of the prior
agreed temporary injunction.  She additionally requested that the court
permanently enjoin Anthony from removing B.J.W.S. from the Women’s Center in
Angleton, Texas at any time; harassing her, her family, friends, employers,
co-workers, B.J.W.S., and B.J.W.S.’s teachers and caretakers; and communicating
with her at any time, except through one weekly email regarding only matters
concerning the child.

Dr. Robert Gordon, the clinical and forensic
psychologist appointed to conduct a psychological assessment of Anthony,
testified first at trial.  Dr. Gordon explained that he had initiated Anthony’s
evaluation by speaking to Amanda and getting a “history,” seeing B.J.W.S., and
performing a home study of Amanda’s home.  He had not met Anthony nor gotten
any information from him.  Dr. Gordon stated that his office had attempted to
set up Anthony’s evaluation, but had been unsuccessful.  Dr. Gordon testified
positively about Amanda’s relationship with B.J.W.S., and explained that he
believed Amanda wanted Anthony involved in B.J.W.S.’s life.

            Amanda testified
next, explaining that she and Anthony had never been married but had been
involved in a “dating relationship” at the time B.J.W.S. was conceived.  She
was unaware at the time B.J.W.S. was conceived that Anthony had a disabling
mental health issue.  She explained that, when she first started dating
Anthony, Anthony himself was unaware his parents were receiving disability
payments for him.  However, Anthony had acknowledged his prior involuntary
institutionalization.  

Amanda testified that she and Anthony had never lived
together.  She lived in Brazoria County, and Anthony lived in the Dallas area. 
According to Amanda, Anthony came to Brazoria County for B.J.W.S.’s birth in
January 2005 and visited B.J.W.S. about two more times in 2005.  Anthony stayed
at her parent’s home until she moved into her own home; thereafter, he stayed
at her home when he came to visit B.J.W.S.  By March or April of 2006, she no
longer considered them dating, but her intention was to remain friendly with
Anthony so that he could continue to see B.J.W.S.  She testified that Anthony
visited B.J.W.S. about monthly during 2006.  

Amanda discovered in October 2004 that Anthony was
receiving mental health disability payments, but was not aware of the nature of
his disability.  According to her, Anthony’s behavior “escalated” from March or
April of 2006 to April of 2007.  Although she continued to leave B.J.W.S.
unsupervised with Anthony, she testified that she was anxious about doing so
and had her family check in on them.  She also would call regularly to find out
whether Anthony was feeding or changing B.J.W.S.  Amanda noted that B.J.W.S.
was never left alone with Anthony overnight.  

            According to
Amanda, in April 2007, Anthony admitted going through her purse while she and
B.J.W.S. were at the park.  Because of this incident and Anthony’s prior
behavior, she informed Anthony that he could no longer stay at her house when
he visited B.J.W.S.  Amanda explained that after this development, Anthony
started “bombarding” her with emails, voicemails, and harassing behavior.  She
became concerned about the nature of Anthony’s communication with B.J.W.S.’s
teachers, and believed that he had harassed and threatened at least one of
B.J.W.S.’s day-care workers.  She also feared she might have to find a new day
care for B.J.W.S. because of Anthony’s behavior.  

Amanda further described two incidents that occurred
when Anthony was with B.J.W.S. without supervision.  In the first, which
occurred in March or April 2007, Anthony left B.J.W.S. locked in the car while
he went into a restaurant to pick up food.  When he was inside the restaurant,
Anthony met Amanda’s brother and stayed in the restaurant longer than
anticipated while B.J.W.S. was locked outside in the car. 

The second incident occurred after Amanda filed suit
and the parties had entered into the Rule 11 Agreement requiring that Anthony’s
visitation be supervised.  In September or October 2007, Anthony, his mother,
and B.J.W.S. went to a local mall, but Anthony’s mother left Anthony and
B.J.W.S. alone when she went into a department store.  Anthony and B.J.W.S.
began playing on a rocky indoor fountain, and B.J.W.S. fell and injured the
back of his head.  

            Amanda
additionally was concerned about the “secretive” manner in which he and his
family treated his mental disability.  She expressed concern that Anthony’s
mother apparently controlled his finances; all the monetary support she was
ever provided for B.J.W.S. was paid by checks from Anthony’s mother.  Amanda
testified that Anthony never expressed any desire to provide financial support
for B.J.W.S.

In October 2007, Amanda was made aware of a website
that included hundreds of pages of information about herself, her family, and
her friends that was “completely inappropriate for anyone to see.”  She
explained that this MySpace.com website, created by Anthony, included pictures
of her, named the city she resided in, revealed the names and email addresses
of many of her friends, and included “personal, financial, [and] sexual
information.”  She stated that she felt “stalked” by Anthony and that others
also felt that way.  She indicated a concern about the escalation of Anthony’s
behavior because she did not know how far he might go and did not want to live
in fear.

Amanda’s next witness was Anthony, called adversely. 
Anthony testified that he had not worked since he was eighteen years old, when
he worked “for about a month.”  He admitted that he had not cooperated with the
trial court’s order for a mental examination.  He acknowledged that he had been
diagnosed with psychosis, schizophrenia, depression, and obsessive-compulsive
disorder.  However, he claimed his last diagnosis was in 2000, and he was no
longer on any medication or under the care of a psychologist or psychiatrist. 
He admitted that his disability prevents him from working because he “cannot
engage in long-term, stressful, day-to-day activities” that are out of his
control.  

In response to questioning regarding his lengthy
mental health history and concerns about his current mental health status,
Anthony replied that only “recent times” should be relevant.  However, he
admitted that he is currently on mental health disability and is not
“fraudulently receiving those benefits[.]”  He further admitted that he is
currently mentally disabled and acknowledged that he has not produced his
mental health records or participated in a psychological evaluation despite
numerous court orders to do so.[2] 
Additionally Anthony stated that he does not manage his own finances directly,
but he has to budget what he spends from funds provided to him by his parents.

After Amanda rested her case, Anthony took the stand
on his own behalf.  He admitted much of the behavior that Amanda described, but
attempted to explain his conduct.  He justified B.J.W.S.’s injury from falling
on the fountain by stating that many kids climb around that fountain.  He
further explained that he had invaded Amanda’s privacy because his relationship
with her was his first relationship, and he was concerned that she was seeing
other people.  He admitted that he had called B.J.W.S.’s caretakers and day-care
workers and sent them messages about his perceived rights in an effort to get
information about B.J.W.S.’s education.  The following are some typical
excerpts from his testimony, which spanned roughly an hour and forty-five
minutes and eighty-one pages in the record:

            If I’m just earning money just to earn money –
and especially full-time, I don’t – I don’t – I just can’t imagine working
full-time.  That’s a lot of – you know, unless I loved that job, unless that’s
something I really, really want to do; and I have a certain amount of control
over my job; and, you know, it fits around my own personal schedule, then, you
know, someday I can see myself working full-time.  But currently, no, I can’t
see myself doing that.

            And in regards to my disability, I mean, you
know, I could care less what the psychiatrists say.  You know, I didn’t see
them voluntarily.  You know, I don’t care about my diagnoses.  And what I care
about is just – you know, I don’t want to take medication.  I don’t believe in
taking psychiatric medication.

. . .

            And, you know, because whatever I receive is
not enough to pay for my needs; and Amanda has admitted that, you know, she has
enough money to pay for attorney’s fees and, you know, to meet all her needs
and also [B.J.W.S.]’s needs.

            You know, it wouldn’t be in the best interest
of someone of my income to be giv[ing] the little I have to Amanda.  You know,
to me, it’s obvious that she’s not, you know, acting in the financial best
interest of anyone; and, you know, given the amount that my parents have
contributed, you know, they’ve contributed way more than, you know, they needed
to and the fact that, you know, I will be incurring expenses, travel expenses
to see my [child].

Anthony sought joint managing conservatorship, with
at least a standard possession order.  He additionally requested that Amanda
reimburse him for all past and future expenses he incurred visiting B.J.W.S.
and argued that there was “no reason” for him to pay child support. 

At the end of the bench trial, the trial court named
Amanda sole-managing conservator, named Anthony a possessory conservator with
supervised visitation only, ordered Anthony to pay child support, and entered a
permanent injunction mutually enjoining Amanda and Anthony from (a) communicating
with each other except for arranging visitation or communicating about other
matters involving B.J.W.S. and (b) making disparaging remarks about each other
or their families.  Anthony was further enjoined from removing B.J.W.S. from
the supervising party during any period of possession.  

II.  Analysis

            As noted above,
Anthony, a pro se litigant, has filed a brief containing seventeen
issues, with numerous sub-issues.[3]  Under
our Rules of Appellate Procedure, where, as here, the issues are settled, we
“should write a brief memorandum opinion no longer than necessary to advise the
parties of the court’s decision and the basic reasons for it.”  Tex. R. App. P.
47.4.  After reviewing Anthony’s issues carefully,[4]
it is apparent that there are five categories of issues relevant to our
disposition of this case:  (1) conservatorship; (2) possession and access; (3)
child support; (4) injunctive relief; and (5) post-trial motions.  For the sake
of clarity, we consolidate his seventeen issues into these five broader
categories and confine our discussion to these subjects.

A.        Standard of Review:  Conservatorship, Possession and
Access, and Child Support

A trial court has broad discretion to decide the best
interest of a child in family law matters such as custody, visitation,
possession, and child support.  See Worford v. Stamper, 801 S.W.2d 108,
109 (Tex. 1990) (child support); Gillespie v. Gillespie, 644 S.W.2d 449,
451 (Tex. 1982) (custody, control, possession, visitation); In re A.L.E.,
279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)
(conservatorship).  A trial court abuses its discretion when it acts
arbitrarily or unreasonably, or when it clearly fails to correctly analyze or
apply the law.  See In re D.S., 76 S.W.3d 512, 516 (Tex. App.—Houston
[14th Dist.] 2002, no pet.).

We remain mindful that the trial judge is best able
to observe and assess the witnesses’ demeanor and credibility, and to sense the
“forces, powers, and influences” that may not be apparent from merely reading
the record on appeal.  A.L.E., 279 S.W.3d at 427.  Therefore, we defer
to the trial court’s resolution of underlying facts and to credibility
determinations that may have affected its decision, and will not substitute our
judgment for the trial court’s.  Id.

Legal and factual insufficiency challenges are not
independent grounds for asserting error in custody determinations, but are
relevant factors in assessing whether the trial court abused its discretion.  Id.
at 427–28.  An abuse of discretion does not occur if some evidence of a
substantive and probative character exists to support the trial court’s
decision.  Id. at 428.  We consider only the evidence most favorable to
the trial court’s ruling and will uphold its judgment on any legal theory
supported by the evidence. Worford, 801 S.W.2d at 109; A.L.E.,
279 S.W.3d at 428.

1.         Conservatorship

Anthony challenges the legal and factual sufficiency
of many of the trial court’s findings regarding conservatorship in issues one
through four.  But, as stated above, legal and factual sufficiency challenges
are not independent grounds for asserting error in a custody case.  See
A.L.E., 279 S.W.3d at 427–28.  However, in the interest of justice, we nonetheless
address Anthony’s conservatorship issues.

There is a strong presumption that the best interest
of a child is served if a natural parent is appointed as a managing
conservator.  Lewelling v. Lewelling, 796 S.W.2d 164 (Tex. 1990); In
the Interest of A.D.H., 979 S.W.2d 445, 447 (Tex. App.—Beaumont 1998, no
pet.); see also Brook v. Brook, 881 S.W.2d 297, 299 (Tex.1994); Tex. Fam.
Code Ann. § 153.131(a) (Vernon 2008).  A parent shall be appointed as sole
managing conservator, or the parents as joint managing conservators, unless the
court finds the appointment would not be in the best interest of the child
because it would significantly impair the child’s physical health or emotional
development.  Tex. Fam. Code Ann. § 153.131(a).  There must be evidence to
support the logical inference that some specific, identifiable behavior or
conduct of the parent will probably cause that harm.  In the Interest of
M.W., 959 S.W.2d 661, 665 (Tex. App.—Tyler 1997, writ denied).

Here, Anthony admitted that he has been diagnosed
with several serious mental conditions and is still receiving government
disability benefits based on these diagnoses.  He consistently refused to
provide any information about these diagnoses and refused to undergo a mental health
evaluation, even though ordered repeatedly by the trial court to do so.  The
trial court concluded that uncontroverted evidence of Anthony’s disability,
coupled with his refusal to provide either any records or participate in a
mental health evaluation, left it with the limited evidence of the
determination made by the Social Security Administration—i.e., that Anthony
currently suffers from a mental health disability.  In addition, twice when
Anthony was alone with B.J.W.S., he endangered B.J.W.S.’s health and safety by
permitting him to jump off a rocky fountain and by leaving him alone in the
car.  

After thoroughly reviewing the record, including the
voluminous emails and other communications from Anthony to Amanda and others,
we believe there is sufficient evidence to overcome the presumption that
appointing both parents as joint managing conservators in this case would be in
B.J.W.S.’s best interests.  See Tex. Fam. Code Ann §§ 153.002 (“The
best interest of the child shall always be the primary consideration of the
court in determining the issues of conservatorship and possession of and access
to the child.”), 153.131 (noting that it is a rebuttable presumption that the
appointment of the parents of a child as joint managing conservators is in the
child’s best interests).  Thus, we cannot say the trial court abused its
discretion in naming Amanda sole managing conservator and appointing Anthony
possessory conservator of B.J.W.S.  We overrule his conservatorship issues.

2.         Possession
and Access

 In this section of his brief, encompassing issues
five through nine, Anthony challenges the trial court’s deviation from the
standard-possession order, as well as challenging the trial court’s
electronic-communications order.  We conclude that the trial court did not
abuse its discretion in deviating from the standard-possession order, but agree
with Anthony that the trial court abused its discretion in entering the
electronic-communications order as written.  

            (a).      Deviation from Standard
Possession Order

The Family Code provides that there is a rebuttable
presumption that the standard possession provides reasonable minimum possession
for a parent named joint managing conservator and is in the best interest of
the child.  See Tex. Fam. Code Ann. § 153.252. In addition, the Family Code
sets out the factors the court may consider in ordering other than the standard
possession.  See id. § 153.256.  Those factors include the age,
developmental status, circumstances, needs, and best interest of the child, the
circumstances of the conservators, and any other relevant factors.  Id.

The trial court here found that entry of a
standard-possession order would not be in B.J.W.S.’s best interests.  For the
same reasons as discussed above in the Conservatorship section of this opinion,
we agree that the trial court did not abuse its discretion in deviating from
the standard-possession order.  We therefore overrule Anthony’s fifth, sixth,
and seventh issues.

            (b).      Electronic-Communications
Order

In his ninth issue,[5] Anthony
challenges the trial court’s entry of the electronic-communications order in
its final order.  The Family Code provides:

If a court awards a conservator periods of electronic
communication with a child under this section, each conservator subject to the court’s
order shall:

(1)       provide
the other conservator with the e-mail address and other electronic
communication access information of the child; 

(2)       notify
the other conservator of any change in the e-mail address or other electronic
communication access information not later than 24 hours after the date the
change takes effect; and 

(3)       if
necessary equipment is reasonably available, accommodate electronic
communication with the child, with the same privacy, respect, and dignity
accorded all other forms of access, at a reasonable time and for a reasonable
duration subject to any limitation provided by the court in the court's order.

Tex. Fam. Code § 153.015(c). 
Here, the trial court failed to require that Amanda notify Anthony of any
change in the e-mail address or other electronic communication access
information not later than 24 hours after the date the change takes effect.  See
id.  The trial court thus abused its discretion in crafting an order that
does not comport with the statutory requirements.  We sustain Anthony’s ninth
issue and modify the trial court’s order to comply with this requirement. 

3.         Child Support

In his tenth, eleventh, and twelfth issues, Anthony
challenges the trial court’s child support orders.  Anthony has not challenged
the trial court’s finding that “No evidence was introduced to establish that
Anthony . . . is unable to obtain employment at the minimum hourly wage.” 
Indeed, even Anthony’s own testimony reflects that he probably could obtain
employment:

If I’m just earning money just to earn money – and
especially full-time, I don’t – I don’t – I just can’t imagine working
full-time.  That’s a lot of – you know, unless I loved that job, unless
that’s something I really, really want to do; and I have a certain amount of
control over my job; and, you know, it fits around my own personal schedule,
then, you know, someday I can see myself working full-time.  But currently,
no, I can’t see myself doing that.

Amanda further testified that
she knew of no reason why Anthony could not work.  

            The Family Code
provides that, in the absence of wage or salary income evidence, the court shall
presume that a party has wages or salary equal to the federal minimum wage for
a 40-hour work week.  Tex. Fam. Code Ann. § 154.068.  That is exactly what the
trial court did here, and we must presume that an order conforming to the
guidelines is reasonable and in the best interest of the child.  Id. §
154.122(a).  We thus overrule Anthony’s tenth and eleventh issues.  Anthony’s
twelfth issue is contingent upon his tenth and eleventh issues; we thus
overrule this issue as well.

B.        Injunctive
Relief

            In his thirteenth
issue, Anthony asserts that the evidence is legally and factually insufficient
to support the trial court’s implied findings regarding the language in the
order permanently enjoining him from certain specified behavior.  Specifically,
Anthony argues that there is insufficient evidence to support the trial court’s
implied findings necessary for entry of a traditional permanent injunction, i.e.,
findings of a wrongful act, imminent harm, irreparable injury, and no adequate
remedy at law.  Jones v. Landry’s Seafood Rest., Inc., 89 S.W.3d 737,
742 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

            When the best
interests of the child are at issue, as they are here, sufficiency of the
evidence is not the appropriate standard of review.  Rather we must determine
whether the trial court abused its discretion.  Cf. A.L.E., 279 S.W.3d
at 427–28.  

Further, we note that where the Family Code discusses
injunctive relief, it generally dispenses with these traditional requirements. 
See Tex. Fam. Code Ann. § 105.001; see also Peck v. Peck,
172 S.W.3d 26, 36 (Tex. App.—Dallas 2005, pet. denied) (concluding that
traditional requirements for permanent injunctive relief are inapplicable in
custody portion of a final divorce decree).  There can be no question that
courts routinely grant permanent injunctions consistent with the best interests
of the child.  See, e.g., Peck, 175 S.W.3d at 35; In re A.C.J.,
146 S.W.3d 323, 328 (Tex. App.—Beaumont 2004, no pet.); In re A.J.L.,
108 S.W.3d 414, 419 (Tex. App.—Fort Worth 2003, pet. denied).  

We have reviewed the record surrounding entry of this
injunction, and Anthony has shown no abuse of discretion.  We overrule
Anthony’s thirteenth issue.

C.        Post-Trial
Motions

            In issue fifteen,
Anthony complains that the trial court abused its discretion by not hearing his
post-trial motions.  The trial court signed a final judgment on August 15,
2008.  Anthony filed seven post-trial motions on October 20, 2008, but the
trial court heard none of them because it concluded it no longer had plenary
jurisdiction.

            Anthony claims
not to have received the required notice of the final judgment.  See
Tex. R. Civ. P. 306a (4).  Consequently, he filed a motion in this Court
seeking a determination from the trial court regarding the date he first either
received notice or acquired actual knowledge the judgment was signed.  We
abated his appeal for that purpose.  The trial court determined that Anthony
acquired actual knowledge of the final judgment on September 29, 2008.

            Anthony
subsequently filed one motion to suspend or reduce child support in this
Court.  We again abated this appeal for the trial court to conduct a hearing on
that motion.  The trial court conducted a hearing on Anthony’s motion on
February 5, 2010 and denied the motion.  

Anthony took no further action to obtain rulings on
the other motions he filed in the trial court.  We therefore overrule his fifteenth
issue.[6]

III.  Conclusion

We conclude that the trial court abused its
discretion by failing to require, as part of its electronic-communications
order, that Amanda notify Anthony within 24 hours of any change in B.J.W.S.’s
email address or other electronic communications access information.  We
therefore modify the trial court’s order to reflect this requirement. 
Otherwise, for the reasons stated above, we affirm the trial court’s judgment.

 

 

                                                                                    

                                                                        /s/        Kent
C. Sullivan

                                                                                    Justice

 

 

Panel consists of Justices Brown, Sullivan, and Christopher.




Appendix

 

1.     
Is the evidence legally and
factually sufficient to support the trial court’s finding that Anthony has “a
substantial mental health history based on the admission of Respondent
[Anthony] under oath[?]”

2.     
Is the evidence legally and
factually sufficient to support the finding that the parties are unable to
communicate effectively about any issue concerning the child?  

3.     
Does the trial court’s finding
that Anthony “has consistently refused to participate in the production of
evidence that might provide some possibility that Respondent [Anthony] is not a
danger to the child, even though the Court ordered psychological assessment and
the production of mental health records for in camera inspection,” constitute a
sanction and are any orders based on this finding a sanction?  

a.     
The trial court’s findings,
orders, and sanctions are waived because Amanda failed to secure a pre-trial
ruling on discovery issues.

b.     
Was Anthony given notice and hearing
regarding the trial court’s sanction?

c.     
Are the sanctions just?

d.     
Is the evidence legally and
factually sufficient to support the finding of this Issue (not sub issue)?

4.     
Is the evidence legally and
factually sufficient to support the finding and conclusion that the trial court’s
orders are in the best interest of the child?  

5.     
Is the evidence legally and
factually sufficient to support the finding that “The Court finds specifically
that Anthony . . . has been a danger to the child in the past, by leaving the
child unsupervised in the car and other negligent acts?”

a.     
Is the evidence legally and
factually insufficient to support the finding that Anthony . . . has been a
danger to Brandon in the past because of the “fountain incident?”

6.     
Is the evidence legally and
factually insufficient to support the finding that “Anthony . . . . may be a
danger to the child in the future, based on his aberrant behavior up to this
point, his admitted psychological conditions, and his persistent refusal to be
evaluated as ordered by the Court?”

7.     
Is the evidence legally and
factually insufficient to support the trial court’s findings and conclusions
that “[a]ll decisions of this Court contemplate most importantly the safety and
best interest of the child.  On that basis, the Court cannot apply the
presumptions of the Texas Family Code relative to ... possession and access in
this cause,” (4 RR 893) and “The Court finds, based on the evidence introduced
in trial, that the Standard Possession Order in the Texas Family Code is not in
the best interest of the child” (4 RR 897)? Anthony also challenges the trial
court’s conclusions that “all legal prerequisites to the establishment of a
parenting plan have been met” (5 CR 979, number 3) and “all variances in the
Court’s order from the presumptions in the Texas Family Code are necessary to
safeguard the best interests of the child” (5 CR 980). 

8.     
Did the trial court abuse its
discretion by finding the electronic communications order is in the best
interest of Brandon?  

9.     
Did the trial court abuse its
discretion by not making the electronic communications order enforceable and
compliant with Texas Family Code?  

10.
Is the evidence legally and factually
sufficient to support “the amount of child support ordered by the Court is in
accordance with the percentage guidelines[?]”  

11.
Is the evidence is legally and
factually sufficient to support the trial court’s implied finding or conclusion
that the amount of child support ordered is just, appropriate, reasonable and
in the best interest of the child?  

12.
Did the Trial Court Abuse Its
Discretion by Ordering Anthony to Pay Additional Child Support (4 CR 905) to
Amanda?  

a.     
Did the trial court abuse its
discretion by ordering Anthony to pay for 50% of Brandon’s uninsured medical
costs?

13.
Is the evidence legally and
factually sufficient to support any of the trial court’s implied findings and
conclusions regarding the permanent injunction?

14.
Is the evidence legally and
factually sufficient to support the award of appellate and Texas Supreme Court
attorney’s fees?  

15.
Did the trial court abuse its discretion
by not hearing Anthony’s post trial motions?  

16.
Did the trial court abuse its
discretion by not using the significantly impair standard found in Tex. Fam.
Code, Section 153.131(a)?  

17. Did the trial court abuse its discretion by not using
the clear and convincing burden of proof?  

 

 









[1] Amanda
and Anthony have never been married.





[2] The
following exchange illustrates Anthony’s behavior in response to the orders to
produce his mental health records:

Q.        And instead of
going out and producing the records as ordered by the Court on at least two
different occasions, you chose to spend all of your time drafting mandamus
documents and affidavits of indigency and request[s] for free records and
motions to compel on us and all kinds of discovery motions and new motions to
modify temporary orders.  Is that what you spent your time on?

A.        For the most part,
yeah.





[3] A list
of Anthony’s actual issues, taken verbatim from his brief, is included as an
Appendix to this opinion.  We note that several of Anthony’s issues may be
disposed of based on briefing waiver.  See Tex. R. App. P. 38.1(i)
(requiring that a brief must contain a clear and concise argument for the
contentions made, with appropriate citations to authorities and the record); Sterling
v. Alexander, 99 S.W.3d 793, 798–99 (Tex. App.—Houston [14th Dist.] 2003,
pet. denied).  For example, issues 1, 2, 8, 12, 16, and 17 contain neither
clear and concise arguments, nor appropriate citations to authorities.  





[4] One of
Anthony’s issues challenges the trial court’s award of appellate attorney’s
fees to Amanda.  Amanda has not retained an attorney to respond to this appeal,
so this issue has no merit because she will receive no award of fees.  





[5] Anthony
has waived his eighth issue by failing to properly brief it.  See Tex.
R. App. P. 38.1(i).





[6] In his
sixteenth and seventeenth issues, Anthony states “Anthony does not have the
time or space to brief this issue.”  We thus conclude that he has waived these
issues.  Tex. R. App. P. 38(i).