**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00367-CV**
_____

**IN THE INTEREST OF M.Z.K.E.**

_____

**On Appeal from the 410th District Court**
**Montgomery County, Texas**
**Trial Cause No. 16-11-13430-CV**
_____

**MEMORANDUM OPINION**

This is an appeal of a final Order in a Suit to Modify the Parent-Child Relationship after a bench trial. Appellant Mother appeals the judgment, raising two issues: (1) she argues the evidence was not sufficient for the trial court's order that Mother's possession of the child, "Macy,"[1] shall be supervised, and (2) she contends the evidence was not sufficient to support the trial court's order that Mother pay Father $247,056.50 in attorney's fees. For the reasons set forth below, we affirm in part and reverse and remand in part.

_____

[1] We use pseudonyms to refer to the parties and lay witnesses. *See* Tex. Fam. Code Ann. § 109.002(d).

## Background

Mother and Father were married in December of 2011, and the order the trial court modified is the Final Decree of Divorce dated December 26, 2018, which names the parents joint managing conservators of Macy. The subject of the suit is Macy, Mother and Father's child who was five years old at the time of the divorce, and ten years old at the time of the modification trial.

On May 14, 2021, Mother filed a Petition to Modify the Parent-Child Relationship with Request for Temporary Restraining Order. Macy was eight years old at the time the petition to modify was filed. Mother alleged that circumstances had materially and substantially changed since the date of the order to be modified was signed, and she asked to be designated as Macy's sole managing conservator. According to the Petition, Father had "engaged in a history or pattern of child abuse and child neglect[,]" and Mother asked that Father have limited and supervised access to or possession of Macy, including visitation supervised under the Access Builds Children program or similar supervision. Mother further alleged that Father had a "history or pattern of committing family violence" in the two years before Mother filed her Petition and Mother asked the court to render a possession order that would protect Macy's safety and well-being, including ordering that Father's access to Macy be supervised and ordering that exchange of Macy occur in a protective setting. Mother sought temporary orders appointing her temporary sole

managing conservator and a temporary restraining order, enjoining Father from "[d]isturbing the peace of the child or of another party[,] [w]ithdrawing the child from enrollment in the school or day-care facility where the child [was] presently enrolled[, and] [h]iding or secreting the child from [Mother]." Mother attached her affidavit to the Petition, in which Mother alleged that Macy had made a "sexual abuse outcry" after being with Father, and that Macy had also come home with bruises on her legs and had reported that her Father and her Father's girlfriend spanked Macy.

On May 18, 2021, the trial court signed a Temporary Restraining Order and Order Setting Hearing for Temporary Orders against Respondent Father. The order restrained Father from: disturbing the peace of the child or another party; withdrawing the child from school; hiding the child from Mother; and removing the child from Mother's possession.

On June 1, 2021, Father filed his Original Answer, asserting a general denial and seeking attorney's fees. On June 16, 2021, Father filed his Counter-Petition to Modify Parent-Child Relationship. Father asked to be appointed sole managing conservator of Macy, or in the alternative, to remain as a joint managing conservator. Father also sought attorney's fees.

On June 30, 2022, Mother filed her First Amended and Supplemental Petition to Modify Parent-Child Relationship with Second Request for Temporary

3

Restraining Order. Mother alleged that Father had engaged in a history of child abuse and neglect as well as family violence. Mother also asked for an increase in the amount of child support Father pays. Mother further asked the trial court to order a psychological evaluation and full mental examination of Father, that Father be ordered to make payments to support Mother until a final order is signed, and that Father pay attorney's fees.

On July 5, 2022, Mother filed her Second Amended and Supplemental Petition to Modify Parent-Child Relationship with Second Request for Temporary Restraining Order, which was Mother's live petition at the time of trial. Mother alleged that the circumstances of the child or parties have materially and substantially changed since the order to be modified was signed and asked to be designated sole managing conservator of Macy; for Father not to have access to Macy or, in the alternative, that Father's visitation with Macy be supervised; and for Father's child support to be increased. Mother also alleged that Father had engaged in a history or pattern of child abuse and neglect and family violence and had not adequately fed Macy. Mother asked for temporary orders for a child custody evaluation and a psychological and mental evaluation of Macy and of Father. She further requested a TRO enjoining Father from disturbing the peace of the child or other party; withdrawing the child from enrollment in school or day care; and hiding or secreting the child from Mother. Mother also sought attorney's fees. According

4

to the Petition, "two or more potential Parental Child Abduction factors exist[,]" and Mother asked the trial court to consider additional measures to protect Macy from abduction by Father. Mother attached her Declaration to the Petition in support of her allegations.

On September 15, 2022, Father filed his First Amended Counter-Petition to Modify Parent-Child Relationship, which was Father's live counterpetition at the time of trial. According to the Counter-Petition, the circumstances of the child or other party have materially and substantially changed since the order to be modified was signed, and Father asked to be appointed sole managing conservator of Macy or, in the alternative, to remain joint managing conservator. Father also asked that, if he is appointed conservator with the exclusive right to designate Macy's primary residence, Mother be ordered to pay child support and he not be required to pay child support. Father also sought temporary orders for a psychological evaluation of Mother. Father requested a permanent injunction enjoining Mother from: taking Macy for health care except in an emergency; authorizing a SANE (Sexual Assault Nurse Examiner) examination of Macy; and taking photographs of Macy when she is naked or of her genitals. Father also sought attorney's fees.

That same day, Father filed a Motion for Enforcement, alleging that Mother had violated terms of the parties' Final Decree of Divorce nineteen times by taking

Macy for psychological treatment without getting Father's prior agreement.[2] Father asked for Mother to be held in contempt and sought attorney's fees for enforcement of the prior order. In Mother's responses, she asserted that she did not take Macy for any psychological treatment but "merely did what was told she should do" in response to outcries by Macy.

On October 4, 2022, Mother filed a "Supplemental Motion to Hear and to Grant the Motion for Mental Examination of [Father.]" Mother alleged that Father has evaded service, tried to strangle her, and made false claims against Mother, and that Macy "may be at risk" when in Father's possession. Mother asked the trial court to hear evidence and order a psychological examination of Father.

The matter was tried to the bench on July 31 through August 4, 2023. On August 22, 2023, the trial court entered an Interim Order ordering that Father shall have the exclusive right to consent to psychiatric and psychological treatment of Macy.

---

[2] The Final Decree of Divorce stated, in relevant part, that both parties, as joint managing conservators, had the right "to confer with the other parent to the extent possible before making a decision concerning the health, education, and welfare of the child[.]"

Mother's Testimony

Mother works as an electrical engineer for Cisco Systems. She testified she had master's degrees in electrical engineering and telecommunications.

According to Mother, she had met with Dr. Tinder before the divorce, Dr. Tinder conducted a custody evaluation, and Mother believed that Child Protective Services (CPS) was called as a result. Mother testified that after the divorce but before she filed her original petition to modify, she had problems with Father, she saw bruises on Macy's "private area[,]" and she took Macy to the pediatrician. Mother agreed she took pictures of bruises on Macy's shins and "private part[,]" and she took Macy to the doctor and to Texas Children's Hospital in Conroe in February of 2019. Mother agreed that, at the hospital, she reported that Father "will turn [Macy] upside down and pinch her private parts[.]" According to Mother, CPS asked her questions in the hospital. Mother agreed she took Macy to the hospital again in March of 2019 after discovering "bruises again in [the child's] labia." During this visit, someone from the sheriff's office questioned Mother and Macy, and an ambulance took Macy to Texas Children's Hospital in downtown Houston. Mother testified that CPS had a forensic interview with Macy and that she did not remember

---

[3] We limit our discussion of the evidence to the issues Appellant raises on appeal. *See* Tex. R. App. P. 47.1.

the dates of all of Macy's bruises because there were so many incidents. Mother agreed she told nurses at Texas Children's Hospital that she suspected Father of physical and sexual abuse because of the bruises she found on Macy. And Mother agreed that Macy had a SANE exam in March of 2019. Mother further agreed that there were five reports involving child abuse, assault, or sexual assault of Macy since March of 2018, and, as of March of 2019, there were three allegations of sexual abuse against Father. Mother also testified that at some point, Macy "[p]ossibly[]" told Mother that Father kissed Macy where "she might go poop[.]"Mother understood that in February of 2019, the hospital staff had a low suspicion of sexual abuse.

Mother recalled an incident in September of 2020 when Macy fell in the driveway after Father brought her back to Mother's house. According to Mother, Father pulled on Macy's backpack while Macy was getting out of the car, and Macy fell. Mother testified that she spoke to the police and told them she did not want charges filed. Mother also testified that a CPS worker contacted her in May of 2021. Mother also recalled taking Macy for counseling at The Women's Center, where Macy had about seventeen counseling sessions, and Mother started seeing Dr. Harrison in 2022. Mother testified that there were plans to terminate Macy's sessions at The Women's Center, but in April of 2022, The Women's Center advised Mother that Macy had reported that "my daddy licks my private parts[.]"

Mother recalled going to see Dr. Harrison with Macy on May 27, 2022, but she did not agree that she and Macy talked about a sexual abuse allegation in the car on the way to Dr. Harrison's office. According to Mother, she had no idea that Macy was going to outcry to Dr. Harrison about a new sexual abuse allegation, and Mother agreed that she told Macy that if Macy had something to tell Dr. Harrison, Macy should write it down.

Mother agreed she talked with a detective in July of 2021, and she believed that CPS thought she was coaching Macy. She also agreed she told detectives that she and Macy had hand signals that Macy came up with because Macy was worried to go to her Father's house. According to Mother, using hand signals was important because Mother needed to protect Macy from being in danger and to make sure Macy was safe from Father. She agreed she was asked to take Macy for a SANE exam at that time, but she did not do so. Mother also agreed she took Macy for forensic interviews to discuss physical and sexual abuse by Father.

According to Mother, Macy always tells her the truth. She recalled law enforcement discussing with her about Macy being inconsistent with her stories. Mother testified that CPS kept saying she was coaching Macy, but Mother insisted she did not coach Macy.

9

Testimony of George

George testified that he is a friend of Mother's and he has seen bruises on Macy's knees and shins. He agreed he had heard Macy say things that concerned him and that he had encouraged Mother to seek psychological assistance.

Testimony of Cindy

Cindy testified that she had worked with Mother and was her boss and friend. Cindy recalled that she and her child went to Disney with Mother and Macy a couple of weeks before trial, and there was a short Zoom call between Macy and Father during which Macy "was very upset and a little bit scared." Cindy also testified that she had never had any interaction or conversation with Father.

Testimony of Chad

Chad testified that he had known Mother for about twenty years, and he used to work with her. According to Chad, Mother was easygoing and friendly. Chad had seen Mother with Macy, and Chad thought Macy appeared happy. Chad recalled seeing Mother with Father after the divorce, and he described Father as "a little bit agitated."

Father's Testimony

Father testified that he grew up in Malaysia, where he met Mother, and moved to the United States at age nineteen. He has an undergraduate degree in economics

and an MBA in telecommunications. Father previously worked for Microsoft, and at the time of trial, he worked for Hewlett Packard Enterprise.

Father testified that he likes to travel, and he has taken Macy on several car trips or camping. Father described several photos of Macy's activities with Father including outdoors activities, the zoo, and museums. Father reported that he goes to Macy's school to have lunch with her, but sometimes Mother shows up and insults him. Father offered into evidence numerous photos of Macy and himself with Macy dated from April of 2019 through July of 2022.

Father testified that he knew of five CPS reports in this case, but later discovered there were seventeen reports. He knew that Macy had one SANE exam, but at trial he learned that there was a total of five SANE exams and seventeen allegations. According to Father, he did not know Macy was in counseling at The Women's Center until he had "spen[t] 40 thousand dollars on paperwork[.]" He testified that he was fired from one job because he had to meet with a CPS investigator frequently.

Father testified that there was no truth to the allegations against him of sexual or other abuse. Father also testified that he was not informed of the incident alleged to have occurred in February of 2019. He testified that allegations that he hung Macy upside down, hit her with a hanger, or pinched her privates were not true. He stated there was "[z]ero[]" truth to the allegations on which the TRO was based. He also

testified that he does not use corporal punishment with Macy. Father agreed that Macy's bruises were not "fictitious[,]" but he testified that he thought Mother "prefabricated" stories and "coached" Macy as to the allegations that he licked Macy's privates.

Father testified that, after reading Mother's statements, CPS records, and records from the Sheriff's Department, Father thought that Macy was "coached by her mom so that [Mother] can get custody or to make [his] life miserable." Father testified that he thought Mother was "weaponizing" Macy and "poisoning" her with lies. According to Father, Macy was "easily swayed by her mom[.]" He also found Mother's stories contradictory, and it was hard to determine what was real and what was not. He testified that sometimes Mother would send him thirty-seven messages a day, including at 4:00 in the morning, and at other times, she would not respond to his questions about Macy's bruises or hospital visits, and Mother would sometimes cancel Macy's medical appointments. Father believed Mother needed psychological help and that Mother's lies were detrimental to Macy's health.

Father testified that he had paid over $160,000 in this lawsuit because of the continuous allegations Mother made against him since he filed for divorce, and that the allegations against him were an "amplification" by Mother that was "continuous and nonstop and fictitious." He also testified that he has incurred significantly more legal fees in preparation for trial—about $80,000. Father testified that he cancelled

his zoo memberships due to litigation expenses, that the legal expenses had "devastated" him financially, and his parents send him money. He also testified that he had spent his "whole fortune, [his] retirement, and [his] future just to defend [him]self." Father further explained that he had used savings for Macy's education, his savings, and "everything" to pay his legal fees, including $20-30,000 that he put on his credit cards and borrowing from family. According to Father, not only was he in debt because of having to fight the allegations against him, but Macy has also suffered because he had to use Macy's education fund to pay his legal fees. Father testified that he would be doing well financially but for his legal bills, which he described as "a strangle or chokehold on [him] every day." Father agreed that Mother's behavior or her attorney's behavior, such as being unprepared for trial, caused an increase in attorney's fees in this case.

Father agreed he was asking to be sole managing conservator of Macy, that Mother be restricted from taking Macy to any kind of doctor except for an emergency, for Mother's possession and access to Macy be stopped, to require Mother to get psychiatric and psychological help before Mother's possession and access to Macy is reinstated, and for the court to award him attorney's fees. Father also asked the trial court to require Mother's possession and access to Macy be supervised whenever it was reinstated. Father testified that, if the trial court did not make Father the sole managing conservator, Father feared that Macy would become

an "unproductive person[]" and would make further allegations against him or someone else. He was also afraid he could end up incarcerated based on false allegations.

Dr. Kit Harrison's Testimony and Report

The trial court ordered psychologist Kit Harrison, Ph.D., to perform a custody evaluation in October of 2021. Father's counsel called Harrison to testify as an expert at trial, and Harrison's report was admitted into evidence. Dr. Harrison testified that both parents underwent psychological testing and evaluation, he interviewed the child and observed her with each parent multiple times, he visited each parent's home, and he reviewed Macy's educational and medical records plus law enforcement records.

According to Dr. Harrison, there was a longstanding history of family conflict and allegations of violence in this family. Dr. Harrison testified that Macy may have developed "attachment problems" early in her life when Father's work and travel took him away from home, and that the family's history of conflict had probably harmed Macy.

Dr. Harrison testified that Mother had persistent old issues about Father, and that Mother lacked "insight in terms of being able to examine evidence, facts, and the child's conduct[.]" During his evaluation, he learned that Mother and Macy use hand signals when they talk over FaceTime while Macy is in Father's possession.

14

Harrison was not convinced that Mother was able to separate fact from fiction as to Macy's allegations about Father. He described Mother as "a victim of the child." Dr. Harrison testified that if Mother continued to believe Macy's false allegations that Macy herself did not believe, then Macy would be at risk for developing psychological problems and that Mother should seek psychological help. According to Harrison, he observed evidence of Factitious Disorder Imposed on Another[4]—that Macy imposed false information on Mother and Mother participated, resulting in Macy and Mother having a "shared misbelief." Harrison explained that this disorder typically starts when a parent makes false allegations to the child and then the child picks up on them. Harrison testified that Mother asserted "tremendous, undue influence both intentional and unintentional[]" on the child. He described Mother as "enmeshed" with Macy.

Dr. Harrison testified about a particular incident. On or about April 15, 2022, Mother reported that she observed bruises on Macy when she picked Macy up after

---

[4] Factitious Disorder Imposed on Another was formerly known as Munchausen Syndrome by Proxy. *See Ex parte Wood*, No. WR-93,810-01, 2023 Tex. Crim. App. Unpub. LEXIS 220, at *1 (Tex. Crim. App. May 3, 2023); *In re Marriage of Karsagi*, No. 13-20-00077-CV, 2022 Tex. App. LEXIS 1934, at *6 (Tex. App.—Corpus Christi–Edinburg Mar. 24, 2022, pet. denied) (mem. op.); *In re A.B.V.*, No. 13-18-00457-CV, 2019 Tex. App. LEXIS 1061, at **7-8 (Tex. App.—Corpus Christi–Edinburg Feb. 14, 2019, no pet.) (mem. op.) (expert witness testified that factitious disorder imposed on another "manifests itself where a caregiver intentionally causes another—usually a young child—to become ill in order to benefit herself, such as by obtaining sympathy and attention[]").

Father's period of possession, and Macy had told Mother that Father had "physically beat[en] her seriously" on or around April 11, 2022, and caused bruises. However, Harrison learned from Macy's school that during that period of Father's possession, Mother had been a chaperone for a school outing, Mother had seen Macy at the outing, Mother had changed Macy's clothes, and there were no bruises on Macy. It was only after Macy returned to Mother that Macy reported to her Mother that Father had assaulted her. In addition, Dr. Harrison noted that photos of Macy taken the day after the school outing do not show any bruises on Macy. As a result of these observations, Dr. Harrison concluded that "mom was complicit in the process [and she] was not an innocent victim of her child. She was a participant." Dr. Harrison concluded that the allegations about Macy's bruises in April of 2022 were "shenanigans[.]"

Dr. Harrison described Father as well-educated and "devoted" to education, and as having good insight and he demonstrated an ability to take responsibility for his conduct. He also testified that Father displays anxiety, worry, and "guilt[-]driven behavior." According to Harrison, Macy has a "[l]oving, close, affectionate bond[]" with Father. Harrison learned that Father and his girlfriend had broken off their relationship because "she couldn't handle [the] stress associated with the litigation process [and] the child's poorly supported allegations[.]"

Dr. Harrison testified that Macy was bonded with and enjoyed both parents, yet she made unreliable allegations against Father. He also described Macy as "brilliant, precocious, [and] highly-verbal[.]" In describing Macy, Dr. Harrison stated,

> The child makes poorly supported, very detailed, fictitious allegations about her father in a very pathological way and for all kinds of reasons. And is an extremely precocious, brilliant [] little girl who has made a childhood career of making allegations. And then goes and visits dad and has a great time.

According to Harrison,

> The allegations got so egregious [that] the tail was wagging the dog and it was obvious. The child was manufacturing and making up [] detailed sexual abuse allegations that never occurred and then [Macy] sta[]ted [] that mom knew all about it, and that she had told mom and Mom was supporting her. None of that was true. Mom had no idea what the child had been up to[.]

Harrison testified that, in his report to the trial court, he wrote that Macy's false allegations about her parents was "evidence of the child becoming out of control and poorly supervised."

Dr. Harrison testified that the family dynamic has caused Macy to be traumatized, to feel a need to protect Mother from Father, to retaliate against Father and "even up the score board." He further testified that Macy's exploitation of her Mother was "more egregious and flagrant than [he'd] seen in years and years." Harrison agreed he thought Mother and Macy were "working in concert together[.]" Dr. Harrison testified that Mother should not put up with falsehoods and should

17

confront Macy with reality, and if Mother cannot do so, then the trial court should make Father the primary supervisor and Mother should have supervised visitation. According to Harrison, if the family dynamic is not corrected, the pattern would cause Macy to be self-loathing, delusional, and exploitative and risk her developing borderline personality disorder, antisocial conduct disorder, self-destructive conduct, problems with peers, and manipulativeness. Harrison testified that in the approximately 1,500 family or child custody lawsuits in which he had worked, he had never seen a child as precocious and as "awesomely manipulative[]" as Macy.

Dr. Harrison testified that records from Texas Children's Hospital reflect that it was never determined how Macy got the bruises reported in February of 2019. Based on his examination of Macy and his review of law enforcement and CPS records, he concluded that Father was not abusing Macy. Dr. Harrison described Macy's reports of sexual abuse as "very vague[,]" and he found no factual support for her allegations. Harrison testified that law enforcement investigation found Mother's statements did not match what Macy had reported and that Macy's statements were not reliable. His interviews with CPS personnel indicated CPS thought the allegations against Father were "malicious" and "false[.]"

Dr. Harrison's report, which was admitted into evidence, includes the following observations:

There is no conclusive evidence the child was abused, but there is very clear evidence that several of the allegations are based on factitious reports[.]

. . .

The dynamic between [Macy] and [Mother] is characterized by a mutual fixation and preoccupation on abuse issues that are not substantiated, although [Mother] is not solely responsible for causing false allegations[.]

. . .

[I]nteractions between [Mother] and [Macy] are best conceptualized as a vicious-cycle of disinformation between parent and child more appropriately identified in the clinical and forensic literature as Factitious Disorder Imposed on Another.

. . .

. . . [Macy] feeds factitious (unsubstantiated) information of her own construction, or exaggerates information, making it equally unreliable, to her mother. Mother in turns publishes and amplifies the false information, in part, for her own secondary gain[.]

. . .

[Mother] feels compelled to report anything the child says as the undisputed truth.

Dr. Harrison's report noted that a CPS investigator reported that Macy's allegations had been very inconsistent; that the hospital concluded "low suspicion of sexual abuse[]" after examining a small bruise on Macy's groin; and that the Montgomery County Sheriff's Office closed its case related to the family because the family was uncooperative and because they concluded no abuse or neglect had occurred.

Dr. Harrison's report recommended that the parents remain joint managing conservators; stated that Father tends to maintain better boundaries and meet Macy's emotional needs better; recommended monitoring, supervision, and counseling for the family; recommended "increased physical supervision" of Mother "during her

periods of possession[]" due to her "[c]ontinued involvement with factitious behavior"; and recommended placing Macy with Father if Mother's patterns regarding the allegations against Father did not abate.

Testimony of Father's Attorney

Father's attorney testified on attorney's fees. He testified that he has been licensed since November of 1992 and that the hours he billed in this case were reasonable based on his and his staff's experience level. He testified that through the last invoice, his fees totaled $168,147 and since then, another $78,909 in fees have been incurred. Father's attorney testified that the fees were "excessive" based on the allegations against Father as well as Mother's previous attorney, who produced documents in disarray and with embedded documents, necessitating extra work preparing for trial. Father's attorney testified,

> . . . [Father], I believe, based on my experience in cases like this, has incurred exorbitant fees, not because of what we did intentionally but because of what we had to do to defend him with 18 or so CPS allegations, multiple SANE or vagina[l] exams, multiple forensic interviews. This case required going through thousands of pages [] of medical records to police reports and also Talking Parents.
>
> The multitude of allegations required us to spreadsheet these allegations, to be able to quickly for trial purpose, go through one allegation, be able to pull up specifics of each allegation, loop them to other allegations where they might be mentioned later in the future. It took a tremendous amount of time, labor, and effort to defend these allegations for [Father].

On cross-examination, Father's attorney acknowledged that his fees "are in the top 3 percent[]" and were appropriate for his level of experience, given that he has handled very large cases in his career.

<u>Records Admitted Into Evidence</u>

*a. Law Enforcement Records*

A report by a Montgomery County Sheriff's Office detective in 2020 states that there had been five reports since March of 2018 involving allegations of child abuse, assault and sexual assault of a child, Macy had undergone forensic interviews for every allegation, and a CPS investigator reported that he believed that Mother and Father were using the child for their personal agendas.

A report from February of 2019 states that "[Mother] said that she asked [the child] how she got the bruises and that [the child] keeps changing her story. [] The hospital staff has a low suspicion of sexual abuse." The records also state that "[Macy] made conflicting statements" to the SANE, and the case was rendered inactive due to a lack of evidence and inconsistent statements by Macy. In a supplemental report, a detective wrote that Mother "advised that she was unsure of what to do because [Macy] is always so inconsistent with her statements and would often change her story." The supplement also states that, "in the previous cases, [Macy] has never been consistent on her outcr[ies] and continuously changes her

story[.]" The detective further wrote that a CPS investigator had informed him that the CPS case was closed because the family was "uncooperative[.]"

*b. CPS Records*

CPS records offered into evidence by Father reflect intake reports for September 25, 2020, April 30, 2021, May 4, 2021, May 17, 2021, August 27, 2021, September 16, 2021, and October 8, 2021, that some of the cases were merged, and all were ultimately closed as "ruled out," meaning "it was reasonable to conclude that the alleged abuse or neglect did not occur." The CPS records reflect that there had been a history of allegations relating to Macy, "but the allegations have not been well supported." CPS notes also indicate that "the child and mother had sign language codes that could be used to make an outcry of abuse by facetime [] or in-person[.]" The CPS records indicate that CPS found "evidence of [Macy] being coached by her mother." CPS noted that Dr. Harrison had told CPS he did not have any concerns about Macy being in danger or abused and that neither parent was abusive or neglectful. The CPS case notes also indicate that George told a CPS investigator that he had gotten "different stories" from Macy and he had told Mother "to go to therapy so that she can work on healing from her past but she refuses."

*c. Hospital Records*

Hospital records from March of 2019 include a note that personnel "[d]iscussed with SANE nurse and based on patient and mother's history, SANE

22

exam is not required." The hospital records also note that Mother reported that the child's story changed and that CPS was taking the case.

*d. Other documentary evidence*

Both Mother and Father offered records of the Montgomery County Women's Center relating to Macy that were admitted into evidence. In the records offered by Mother, counseling notes reflect that Macy told a counselor that she only wanted to be with Mother because of what Father did to her. In the records offered by Father, a report from March of 2022 reflects that Macy told a counselor, "you know my daddy licks my private parts[,]" after which Macy changed the subject.

About two hundred pages of messages between Mother and Father via "TalkingParents" were admitted into evidence. Father offered numerous photos of Macy and himself taken from April of 2019 through July of 2022.

Final Order and Findings of Fact and
Conclusions of Law

After the bench trial, the trial court signed an Order in Suit to Modify Parent-Child Relationship appointing Father as Sole Managing Conservator and requiring Mother's possession to be supervised:

> The Court finds that it is not in the best interest of the child that [Mother] and [Father] be appointed as Joint Managing Conservators of the child at this time.
> IT IS THEREFORE ORDERED that [Mother] and [Father] are removed as Joint Managing Conservators and that [Father] is appointed Sole Managing Conservator and [Mother] is appointed Possessory Conservator of the [] child[.]

23

. . . .

> The Court finds good cause to restrict the rights afforded a parent under Tex. Fam. Code § 153.073 due to the conduct of the parties and the psychological impact on the child. . . .
>
> . . .
>
> IT IS ORDERED that all periods of possession of and access with the child, [Macy], by [Mother] shall be under the supervision of Access Builds Children[.]

The trial court also ordered that Macy participate in ongoing counseling and psychological treatment and that both Father and Mother participate in counseling for individual concerns and for co-parenting. The trial court ordered judgment of $247,056.50 against Mother for attorney's fees and costs incurred by Father and requiring Mother to pay all attorney's fees she incurred.

Following entry of the final order, Mother filed a Request for Findings of Fact and Conclusions of Law. The trial court made written Findings of Fact and Conclusions of Law, which included the following findings pertinent to this appeal:

> 26. The court finds that [Father] was a more credible witness than [Mother].
>
> 27. Credible testimony by Dr. Kit Harrison, the custody evaluator, supports the court's rulings on the conservatorship of the child and the rights and duties of the parties.
>
> . . .
>
> *Findings of Fact—Modification of Possession and Access*
>
> 1. The Court finds that the provisions of the possession order as ordered by the court in this modification are the least restrictive means necessary to protect the best interest of the child.
>
> 2. The Court further finds that good cause exists and it is in the best interest of the child to deviate from the Standard Possession Order contained in the Texas Family Code at sections 153.311 through 153.317.

3. Limited, supervised possession and access by [Mother] with the child of this suit as ordered by the court is the least restrictive possession and access schedule that the court could order while still protecting the best interest of the child. The possession and access schedule and the terms and conditions for same were based on the credible facts and evidence and were necessary due to the severity of the harm and future harm to the child.

4. Credible testimony by Dr. Kit Harrison, the custody evaluator, supports the court's ruling on possession and access for [Mother].

5. Unsupervised possession of the child by [Mother] is not in [the child's] best interest.

6. Credible evidence showed that [Mother's] unsupervised possession and access to the child is emotionally harmful to the child due to the years of false allegations of abuse lodged by [Mother] against [Father], and that it would continue to be emotionally harmful to the child in the future. There is credible evidence that it is not in the child's best interest for [Mother] to have unsupervised access to the child.

7. Credible evidence was presented overcoming the presumption that a Standard Possession Order is in the best interest of the child. Supervised possession of the child by [Mother] is the least restrictive means necessary in order to protect the best interest of the child.

8. It is in the best interest of the child that all periods of possession of and access to the child by [Mother] should be under the supervision of Access Builds Children. [Mother] should have Skype communication with the child to supplement these periods of possession.

9. It is in the best interest of the child that [Mother] shall participate in on-going therapeutic counsel with Dr. Jean Guez. It is in the child's best interest that [Mother] and [Father] shall each pay fifty percent (50%) of the costs for the child's individual therapeutic sessions with the child's therapist.

10. It is in the child's best interest that [Mother] shall participate in therapeutic counseling and psychological treatment with Jean Guez [], in the manner, frequency and duration as recommended by said therapist.

11. It is in the child's best interest that [Mother] shall specifically receive counseling and psychological treatment regarding the following:

a. To challenge her beliefs that everything the child the subject of this suit is saying is the absolute truth;

25

b. To deal with past trauma issues that may be impeding her ability to be the best parent she can be to the child;

c. To address her paranoia regarding [Father];

d. To address attachment issues with the child so she [] can make the necessary changes to have a healthier relationship with the child and to prevent further damage to the child;

e. To address all the issues outlined in the written report of Kit W. Harrison, Ph.D., a copy of which to be provided to the therapist; and

f. To work on co-parenting communication through TalkingParents.com.

. . .

14. It is in the best interest of the child that [Mother] should be permanently enjoined from:

a. Disciplining the child using corporal punishment;

b. Communicating with the child using sign language or any language other than English;

c. Making disparaging remarks about the other party, or the other party's family members, including but not limited to the child's grandparents, aunts, uncles, stepparents, or anyone with whom a party has a dating relationship, in the presence or within the hearing of the child;

d. Discussing with the child, or with any other person in the presence of the child, any litigation related to the child or any other party;

e. Photographing the child after a period of possession with the other conservator; and

f. Photographing the child's body parts.

15. A custody evaluation was conducted by Kit W. Harrison, Ph.D. This evaluation was admitted into evidence. The evaluation consisted of clinical interviews, observation of the parties and child, their interactions, and psychological testing. Kit W. Harrison, Ph.D. testified at trial and was credible. The findings of that custody evaluation and the testimony of Dr. Kit Harrison support the court's rulings.

16. The court's rulings on conservatorship, possession, and access are supported by the testimony and report of Dr. Kit Harrison, the custody evaluator appointed in the case.

17. Dr. Harrison testified that [Mother] has engaged in conduct that has been detrimental to and/or significantly endangered the child's physical health and emotional development and well-being.

18. [Mother] has a long history of making allegations against [Father] of physical abuse and/or sexual abuse against the child. These allegations by [Mother] were not credible. The child was subjected to physical examinations as well as a multitude of Safe Harbor interviews that were ultimately detrimental to the child's emotional well-being.

19. Credible evidence was presented by the custody evaluator that [Mother] is enmeshed emotionally with the child [] to a level that is emotionally harmful to the child.

20. Credible evidence was presented that [Mother] created a secret sign-language with [the child] in order for the child to be able to tell her mother that she had been physically abused when on FaceTime or in person while [the child] was in [Father's] possession. This type of behavior is harmful to [the child].

21. The physical and sexual abuse allegations made by [Mother] and [the child] on May 27, 2022, was an attempt to influence the outcome of the child custody evaluation performed by Dr. Kit Harrison.

22. [Mother] committed acts intended to alienate [the child] from her father.

23. [Mother] was requested by Dr. Harrison to name collateral witnesses that he could interview. Before Dr. Harrison could interview one of the witnesses, [Mother] met with that witness and [the child] ma[d]e outcries to her of sexual abuse, which were not credible and which were meant to falsely manipulate evidence.

24. [The child] is bonded emotionally and appropriately to her father [] and appears to enjoy her time with her father. [Father] maintains appropriate physical boundaries with [the child].

25. There was credible evidence that [the child] has an unhealthy fusion with [Mother].

26. There have been numerous CPS (Texas Department of Family and Protective Services) and police investigations primarily initiated by [Mother], all of which have failed to render any credible evidence of child abuse.

27. [Mother] appears to be incapable of reasonably evaluating the allegations that the child makes before taking swift action, and therefore appears incapable of preventing future investigations of allegations of abuse against [Father].

28. There was credible evidence to support Dr. Harrison's finding that [the child] had not been physically abused by [Father] or [Father's girlfriend].

30. Dr. Harrison testified that interactions between [Mother] and [the child] are best conceptualized as a vicious-cycle of disinformation between parent and child more appropriately identified as Factitious Disorder Imposed on Another.

31. Dr. Harrison testified that [Mother] suffered from Factitious Disorder Imposed on Another. He further testified that with Factitious Disorder Imposed on Another, an individual presents another person to others, or in some cases presents themselves, as a victim, ill[,] impaired or injured.

32. Dr. Harrison testified that [the child] feeds factitious (unsubstantiated) information of her own construction to [Mother].

33. The court found credible evidence that if [the child's] behavior remained the same, that more serious overt conduct disorder symptoms would present themselves.

34. [Mother] published and amplified the false allegations of [the child].

35. Credible evidence was presented that [the child] has been subjected to undue influence by [Mother].

36. Credible evidence was presented that because of the actions of [Mother], [the child] over time began making allegations that were no longer directly influenced by [Mother's] leading or suggestive questioning.

. . .

*Findings of Fact—Attorney's Fees*

1. [Father] incurred reasonable and necessary attorney's fees to preserve and protect the rights of the child the subject of this suit in the amount of $247,056.50.

2. Multiple trial resets had to be given due to [Mother's] previous attorney being unable to properly comply with the court's Docket Control Order/Trial Preparation Order (and additional orders) with respect to the listing and exchange of exhibits for trial, which cost [Father] additional attorneys fees in order to prepare for trial.

3. The unsubstantiated allegations made by [Mother] against [Father], and the seriousness of same, caused [Father] to incur a significant amount of reasonable and necessary attorneys fees in order to protect himself and the child.

28

*Findings of Fact as Conclusions of Law*
1. Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

In addition, the trial court made the following Conclusions of Law pertinent to this appeal:

*Conclusions of Law—Modification of Possession and Access*
1. The provisions of the possession order as ordered by the court in this modification are the least restrictive means necessary to protect the best interest of the child.
2. Good cause exists and it is in the best interest of the child to deviate from the Standard Possession Order contained in the Texas Family Code at sections 153.311 through 153.317.
3. The supervised possession schedule ordered by the court is in the best interest of the child and is necessary to protect the child's emotional health and well-being.
4. [Mother] should be awarded the supervised possession and access schedule ordered by the court.
. . .
*Conclusions of Law—Attorney's Fees*
1. [Father's attorney] should be awarded judgment of $247,056.50 against [Mother] for attorney's fees and costs incurred by [Father] for legal representation in this suit, with interest at five percent (5%) per year compounded annually from the date of judgment.

Issues

In her first issue, Appellant Mother argues that the evidence is insufficient to support the trial court's order that Mother's visitation and communication with Macy be supervised.[5] Specifically, Mother challenges certain findings of fact by the trial court, which her brief states as follows:

---

[5] We do not read Mother's brief to challenge the trial court's ruling appointing Father as Sole Managing Conservator and Mother as Possessory Conservator.

18. The Court finds good cause to restrict the rights afforded a parent under Tex. Fam. Code Section 153.073 due to "conduct of the parties and psychological impact on the child."

. . .

26. [Father] was more credible witness tha[n] [Mother].

27. Credible testimony by Dr. Kit Harrison, the custody evaluator, supports the court's rulings on the conservatorship of the child and the rights and duties of the parties.

According to Appellant, these findings "confused 'facts' with 'conclusions of law[,]'" and are "conclusion[s] of fact." Mother argues that the trial court's finding assumes certain facts and that "Dr. Harrison's opinion is fact dependent on the Court making findings that Appellant was coaching the child[, but] Dr. Harrison made no such finding." Further, Appellant argues that Dr. Harrison performed no "forensic analysis" regarding the allegations of sexual assault, but rather he relied on CPS and Montgomery County Sheriff's Office findings. According to Appellant, although the trial court's order stated that "[l]imited, supervised possession and access by [Mother] with the child [] is the least restrictive possession and access schedule that the court could order while still protecting the best interest of the child[,]"the "very restrictive" supervised visitation and communication is not the least restrictive nor reasonable ruling, and the ruling was arbitrary. Appellant argues that Dr. Harrison's conclusions are "unfounded or not supported by his testimony." Appellant contends that the trial court's ruling depends upon a finding that Mother coached or was

complicit in false allegations, which is not supported by the record, or in the absence of such a finding, the trial court's ruling is unreasonable and arbitrary.

In her second issue, Mother argues that the evidence is insufficient to support the trial court's order that Mother pay $247,056.50 in attorney's fees. Mother argues that Father's attorney did not testify about the rates he charged for his own work and his paralegals' work. Mother also argues that Father's attorney included costs and expenses in his attorney's fees.

Standard of Review

In a modification suit, whether the moving party has met the burden of establishing a material and substantial change is a threshold question. *See In re R.A.*, No. 09-20-00275-CV, 2022 Tex. App. LEXIS 7575, at *17 (Tex. App.—Beaumont Oct. 13, 2022, no pet.) (mem. op.) (citing *In re T.M.P.*, 417 S.W.3d 557, 563 (Tex. App.—El Paso 2013, no pet.)). Determination of a material and substantial change is fact specific and not controlled by a set of guidelines. *Id.* (citing *Arredondo v. Betancourt*, 383 S.W.3d 730, 734 (Tex. App.—Houston [14th Dist.] 2012, no pet.)). To be entitled to a modification, the party requesting the modification must prove (1) the modification requested is in the child's best interest, and (2) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the prior order. *See* Tex. Fam. Code Ann. § 156.101(a)(1)(A). Section 261.107 of the Texas Family Code provides.

> A finding by a court in a suit affecting the parent-child relationship that a report made under this chapter before or during the suit was false or lacking factual foundation may be grounds for the court to modify an order providing for possession of or access to the child who was the subject of the report by restricting further access to the child by the person who made the report.

Tex. Fam. Code Ann. § 261.107(b); *see also In re M.M.*, No. 05-21-00992-CV, 2023 Tex. App. LEXIS 242, at **17-19 (Tex. App.—Dallas Jan. 13, 2023, no pet.) (mem. op.).

The trial court is given wide latitude in determining the best interests of a minor child, and we review a trial court's decision pertaining to a modification order under an abuse of discretion standard. *See In re R.A.*, 2022 Tex. App. LEXIS 7575, at *13 (citing *Smith v. Karanja*, 546 S.W.3d 734, 737 (Tex. App.—Houston [1st Dist.] 2018, no pet.)); *see also Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re E.C.C.*, 539 S.W.3d 425, 429 (Tex. App.—Beaumont 2018, pet. denied). A trial court abuses its discretion if it acts arbitrarily or without reference to any guiding rules or principles. *See In re G.J.G.*, No. 09-21-00396-CV, 2023 Tex. App. LEXIS 9542, at **11-12 (Tex. App.—Beaumont Dec. 21, 2023, no pet.) (mem. op.) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985); *In re M.A.M.*, 346 S.W.3d 10, 13 (Tex. App.—Dallas 2011, pet. denied)). "'A trial court abuses its discretion if it imposes restrictions that exceed those required to protect the child's best interest.'" *In re S.C.T.*, No. 09-23-00044-CV, 2025 Tex. App. LEXIS 1254, at *98 (Tex. App.—Beaumont Feb. 27, 2025, no pet. h.) (mem.

32

op.) (quoting *In re B.O.*, No. 02-16-00485-CV, 2017 Tex. App. LEXIS 5497, at \*83 (Tex. App.—Fort Worth June 15, 2017, no pet.) (mem. op.)). A trial court does not abuse its discretion if its order is supported by some evidence of a substantial and probative character. *See In re L.J.L.*, No. 09-21-00286-CV, 2023 Tex. App. LEXIS 6568, at \*12 (Tex. App.—Beaumont Aug. 24, 2023, no pet.) (mem. op.). In determining whether some evidence supports the decision, we review the evidence in the light most favorable to that decision, and we indulge every presumption in its favor. *See In re L.K.S.*, No. 09-23-00364-CV, 2024 Tex. App. LEXIS 5879, at \*14 (Tex. App.—Beaumont Aug. 15, 2024, no pet.) (mem. op.) (citing *In re G.E.D.*, No. 05-17-00160-CV, 2018 Tex. App. LEXIS 8, at \*\*11-12 (Tex. App.—Dallas Jan. 2, 2018, no pet.) (mem. op.)).

The trial court as factfinder "'is the sole arbiter of the witnesses' credibility and demeanor,'" and our review must defer to the trial court's factual determinations. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). The factfinder is the sole judge of credibility of the witnesses and the weight to be assigned to their testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The factfinder is free to believe one witness and disbelieve another, and reviewing courts may not impose their own opinions to the contrary. *See id.* As such, reviewing courts must assume that the factfinder decided all credibility questions in favor of the findings, and chose

33

what testimony to disregard in a way that was in favor of the findings, if a reasonable person could do so. *See id.* at 819-20. We review a trial court's findings of fact for legal sufficiency, and its conclusions of law under a de novo standard of review. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible. *See In re J.F.-G.*, 627 S.W.3d at 312 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). "Anything more than a scintilla of evidence is legally sufficient to support the finding." *In re A.E.A.*, 406 S.W.3d 404, 414 (Tex. App.—Fort Worth 2013, no pet.); *see also In re S.C.T.*, 2025 Tex. App. LEXIS 1254, at *101.

When findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as a jury's verdict; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *In re Marriage of Karsagi*, No. 13-20-00077-CV, 2022 Tex. App.

34

LEXIS 1934, *20 (Tex. App.—Corpus Christi–Edinburg Mar. 24, 2022, pet. denied) (mem. op.). Thus, we defer to unchallenged findings of fact that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014). We overrule an appellant's issue when unchallenged findings or conclusions independently support the trial court's judgment or ruling. *See Patton v. Echols*, No. 09-22-00334-CV, 2024 Tex. App. LEXIS 7751, at *51, *58 (Tex. App.—Beaumont Oct. 31, 2024, no pet.) (mem. op.) (citing *Howeth Invs., Inc. v. City of Hedwig Vill.*, 259 S.W.3d 877, 889 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)).

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002. On appeal, we assess the trial court's best-interest finding by using the *Holley* factors. *See In re D.E.T.*, No. 09-22-00197-CV, 2023 Tex. App. LEXIS 5811, at **18-19 (Tex. App.—Beaumont Aug. 3, 2023, no pet.) (mem. op.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976)). The *Holley* factors include (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) any physical or emotional danger to the child in the present or future; (4) the parental abilities of the individuals involved; (5) the programs available to those individuals to promote the child's best interest; (6) the plans for the child by these individuals; (7) the stability of the home; (8) acts or

omissions by a parent tending to show that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley*, 544 S.W.2d at 371-72. The *Holley* factors are not exclusive, and the evidence that the factfinder considers in making a best-interest decision need not address all the *Holley* factors. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re K.R.K.-L.H.*, 671 S.W.3d 761, 770 (Tex. App.—Beaumont 2023, pet. denied). The factfinder may consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *See In re K.P.*, No. 09-22-00049-CV, 2022 Tex. App. LEXIS 5787, at **29-30 (Tex. App.—Beaumont Aug. 11, 2022, pet. denied) (mem. op.) (citing *In re R.J.*, 568 S.W.3d 734, 751-52 (Tex. App.—Houston [1st Dist.] 2019, no pet.)).

A trial court may place conditions on a parent's access, such as supervised visitation, when it is in the child's best interest. *In re A.G.*, 531 S.W.3d 329, 333 (Tex. App.—Houston [14th Dist.] 2017, no pet.). There is a rebuttable presumption that the standard possession order provides the reasonable minimum level of possession and access for a parent named possessory conservator and is in the best interest of the child. *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (citing Tex. Fam. Code Ann. § 153.252). When determining whether to deviate from the standard possession order, a court may consider "(1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and

36

(3) any other relevant factor." Tex. Fam. Code Ann. § 153.256; *In re J.J.R.S.*, 627 S.W.3d at 218. The terms of an order that deviates from the standard possession order—that is, an order that "denies possession of a child to a parent or imposes restrictions on a parent's right to possession of or access to a child"—"may not exceed those that are required to protect the best interest of the child." *In re J.J.R.S.*, 627 S.W.3d at 218-19 (quoting Tex. Fam. Code Ann. § 153.193). In addition, a court "shall specify and expressly state in the order the times and conditions for possession of or access to the child, unless a party shows good cause why specific orders would not be in the best interest of the child." Tex. Fam. Code Ann. § 153.006(c); *In re J.J.R.S.*, 627 S.W.3d at 219. "[A] severe restriction or limitation, even one that amounts to a denial of access, is permissible if it is in the best interest of the child." *In re Walters*, 39 S.W.3d 280, 286 n.2 (Tex. App.—Texarkana 2001, no pet.).

Supervised Possession

In her first issue, Mother argues that the trial court erred by ruling that Mother should be restricted to supervised visitation with the child twice a month because she contends it is a "strict, limited communication order" not supported by the record. According to Mother, for the trial court to make such a ruling, the trial court "would have had to find that [Mother] coached the child in the allegations, which is not supported by the record." Mother argues that without a finding that Mother coached the child in the allegations against Father, the trial court's ruling was

37

arbitrary and unreasonable and contrary to public policy as articulated in section 153.001 of the Family Code; the trial court misapplied the *Holley* factors; and the trial court's order violated section 153.256 of the Family Code. *See* Tex. Fam. Code Ann. §§ 153.001 ("Public Policy"), 153.256 ("Factors for Court to Consider" when ordering terms of possession of a child other than a standard possession order); *Holley*, 544 S.W.2d at 371-72.

Mother specifically challenges two credibility findings by the trial court—the finding that Father was more credible than Mother and the finding that Dr. Harrison's testimony is credible. As previously explained herein, the factfinder is the sole judge of the credibility of the witnesses and the weight given to their testimony, and in an appeal from a bench trial, we defer to the trial court's factual determinations. *See In re J.F.-G.*, 627 S.W.3d at 312; *In re J.O.A.*, 283 S.W.3d at 346; *City of Keller*, 168 S.W.3d at 819. We lack a basis to reverse the trial court's credibility determinations. As this Court has explained, "'the trial court is in the best position to observe the demeanor and personalities of the witnesses and can "feel" the forces, powers and influences that cannot be discerned by merely reading the record.'" *See Warchol v. Warchol*, 853 S.W.2d 165, 167-68 (Tex. App.—Beaumont 1993, no writ) (quoting *Jeffers v. Wallace*, 615 S.W.2d 252, 253 (Tex. App.—Dallas 1981, no writ)). Because the trial court as factfinder is free to believe one witness

38

and disbelieve another, reviewing courts may not impose their own opinions to the contrary. *See In re L.K.S.*, 2024 Tex. App. LEXIS 5879, at *14.

We read Appellant's brief to challenge an implied finding by the trial court—that the trial court "factually concluded that Appellant coached or was involved in, complicit in, the false allegations with the purpose of alienating the child from the father and concluded that behavior would continue." Ordinarily, when a trial court does *not* issue findings of fact and conclusions of law, then all facts necessary to support the judgment and supported by the evidence are implied. *See BMC Software Belg., N.V.*, 83 S.W.3d at 795 (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987); *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984)). Such implied findings are not conclusive and may be challenged for legal and factual sufficiency. *See id.*

A party may request specified additional or amended findings or conclusions within ten days after the trial court files its findings and conclusions. *In re A.E.D.*, No. 09-13-00555-CV, 2014 Tex. App. LEXIS 10587, at **4-5 (Tex. App.—Beaumont Sept. 4, 2014, pet. denied) (mem. op.) (citing Tex. R. Civ. P. 298). Failure to request a finding on a specific issue generally waives error on the issue. *See id.*; *see also* Tex. R. App. P. 33.1(d) (permitting a sufficiency complaint on appeal from a bench trial "as distinguished from a complaint that the trial court erred in refusing to amend a fact finding or to make an additional finding of fact"); *Vapor Corp. v.*

*Welker*, 582 S.W.2d 858, 862 (Tex. App.—Beaumont 1979, no writ) ("In the absence of a request by appellant to make such a specific finding of fact after the trial court had entered its findings, appellant waived its right to complain of any failure to make any such additional finding of fact."). Here, Appellant has provided no legal support for her argument that this Court should review an alleged implied finding where the trial court made explicit written findings, and she did not request additional specific findings. *See* Tex. R. App. P. 38.1(i) (an appellate brief should cite to the record and to applicable authority). Therefore, we lack a basis to challenge a finding the trial court did *not* make.

That said, Appellant may challenge the factual and legal sufficiency to support the trial court's ruling on appeal. *See* Tex. R. App. P. 33.1(d). In this case, written findings that Mother does not challenge on appeal independently support the trial court's order that Mother's possession of Macy be supervised, namely:

> 2. The Court [] finds that good cause exists and it is in the best interest of the child to deviate from the Standard Possession Order contained in the Texas Family Code at sections 153.311 through 153.317.
> . . .
> 6. Credible evidence showed that [Mother's] unsupervised possession and access to the child is emotionally harmful to the child due to the years of false allegations of abuse lodged by [Mother] against [Father], and that it would continue to be emotionally harmful to the child in the future.
> . . .
> 17. Dr. Harrison testified that [Mother] has engaged in conduct that has been detrimental to and/or significantly endangered the child's physical health and emotional development and well-being.

40

18. [Mother] has a long history of making allegations against [Father] of physical abuse and/or sexual abuse against the child. These allegations by [Mother] were not credible. . . .

19. Credible evidence was presented by the custody evaluator that [Mother] is enmeshed emotionally with the child [] to a level that is emotionally harmful to the child.

20. Credible evidence was presented that [Mother] created a secret sign-language with [the child] in order for the child to be able [to] tell her mother that she had been physically abused when on FaceTime or in person while [the child] was in [Father's] possession. This type of behavior is harmful to [the child].

. . .

22. [Mother] committed acts intended to alienate [the child] from her father.

. . .

25. There was credible evidence that [the child] has an unhealthy fusion with [Mother].

26. There have been numerous CPS [] and police investigations primarily initiated by [Mother], all of which have failed to render any credible evidence of child abuse.

27. [Mother] appears to be incapable of reasonably evaluating the allegations that the child makes before taking swift action, and therefore appears incapable of preventing future investigations of allegations of abuse against [Father].

. . .

34. [Mother] published and amplified the false allegations of [the child].

As previously explained, we overrule an appellant's issue when unchallenged findings or conclusions independently support the trial court's judgment or ruling. *See Patton*, 2024 Tex. App. LEXIS 7751, at *51, *58 (citing *Howeth Invs., Inc.*, 259 S.W.3d at 889). In addition, records from law enforcement, CPS, and Texas Children's Hospital describe their investigations into Mother's and Macy's allegations against Father, and their conclusions that the allegations were

41

inconsistent and not supported by facts. The CPS records reflect that CPS closed its investigation with a disposition of "ruled out"—meaning "it was reasonable to conclude that the alleged abuse or neglect did not occur." Dr. Harrison described the relationship between Mother and Macy as "enmeshed," he described Mother as unable to discern fact from fiction as to Macy's allegations, and he described Macy as "awesomely manipulative." In Dr. Harrison's opinion, the family situation was "dangerous" and Macy was at risk for mood and conduct problems, including self-harm and narcissism. Because there is more than a scintilla of evidence to support the trial court's ruling that supervised visitation was in the child's best interest, we find the evidence legally sufficient. *See In re S.C.T.*, 2025 Tex. App. LEXIS 1254, at *101; *In re A.G.*, 531 S.W.3d at 333; *In re A.E.A.*, 406 S.W.3d at 414.

As to Mother's argument that Dr. Harrison performed no "forensic analysis," we find nothing in the trial court's Agreed Order for Child Custody Evaluation that required Dr. Harrison to perform a forensic analysis. Further, the Order specifically required Harrison to obtain and review school, CPS, health, and law enforcement records. Having considered and rejected Mother's arguments, we overrule her first issue.

## Attorney's Fees

In her second issue, Mother argues that the trial court erred in awarding Father $247,056.50 in attorney's fees because such an award was not supported by the

record in accordance with *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501 (Tex. 2019). According to Mother, Father's attorney did not testify about the rate he charged for his work or his staff's work or whether his rates or charges were customary. According to Mother, an award of $247,056.50 is not supported by sufficient evidence, given that the case included no depositions and a five-day trial. Mother asks this Court to vacate the order as to the award of attorney's fees.

Section 106.002 of the Texas Family Code provides that a court "may render judgment for reasonable attorney's fees and expenses[,]" including judgment and postjudgment interest. *See* Tex. Fam. Code Ann. § 106.002(a). "We review a trial court's award of attorney's fees for an abuse of discretion." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018); *see also In re A.C.J.*, 146 S.W.3d 323, 327 (Tex. App.—Beaumont 2004, no pet.). Under the abuse of discretion standard, the legal and factual sufficiency of the evidence are relevant to determining the reasonableness of attorney's fees and whether the trial court abused its discretion. *See Bebeau v. Bebeau*, No. 09-97-517-CV, 1999 Tex. App. LEXIS 7163, at **11-12 (Tex. App.—Beaumont Sept. 23, 1999, no pet.) (mem. op.) (citing *In re A.D.H.*, 979 S.W.2d 445, 446 (Tex. App.—Beaumont 1998, no pet.)). If there is evidence of a substantive and probative character supporting a trial court's decision, we cannot conclude that the trial court abused its discretion. *See In re*

*E.R.A.*, No. 09-20-00042-CV, 2021 Tex. App. LEXIS 2026, at *11 (Tex. App.—Beaumont Mar. 18, 2021, no pet.) (mem. op.) (citing *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)).

Whether attorney's fees are reasonable and necessary is a fact issue to be determined by the factfinder. *See Rohrmoos Venture*, 578 S.W.3d at 489 (citing *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 231 (Tex. 2010)). And "an amount incurred or contracted for is not conclusive evidence of reasonableness or necessity." *See id.* at 488 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)). The party seeking attorney's fees bears the burden to establish reasonableness and necessity. *See id.* (citing *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding)).

"[T]he fact finder's starting point for calculating an attorney's fee award is determining the reasonable hours worked multiplied by a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts." *Id.* at 498. "[T]he burden is on the fee applicant to produce satisfactory evidence [] that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to -- for convenience -- as the prevailing market rate." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *see also Rohrmoos Venture*, 578 S.W.3d at 499. In awarding

attorney's fees, the trial court "'must take into account various factors such as: the nature and complexity of the case; the nature of the services provided by counsel; the time required for trial; the amount of money involved; the client's interest that is at stake; the responsibility imposed upon counsel; and the skill and expertise required.'" *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009) (quoting *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex. 1990)). One of the factors a court should consider in determining the reasonableness of attorney's fees is "the fee customarily charged in the locality for similar legal services[.]" *Rohrmoos Venture*, 578 S.W.3d at 493-94 (citing *Arthur Andersen*, 945 S.W.2d at 818).

The unchallenged findings of fact regarding attorney's fees bind the parties and appellate court, unless the contrary is established as a matter of law or no evidence supports the findings. *See McGalliard*, 722 S.W.2d at 696; *In re S.C.T.*, 2025 Tex. App. LEXIS 1254, at *127. We will defer to unchallenged findings of fact that are supported by some evidence. *See Tenaska Energy, Inc.*, 437 S.W.3d at 523.

Father's attorney testified that he has been licensed since November of 1992 and that the hours for which he billed in this case were reasonable based on his level of experience and that of his staff. The attorney's billing statements up until the time of trial—from May of 2021 through March of 2023—were admitted into evidence,

45

and they show the initials of the person performing work, a description of the work performed, the hourly rate, and the number of hours worked. The attorney testified that the billing statements total $168,147. The attorney further testified that since the last invoice was submitted, there had been an additional $78,909 in attorney's fees and expenses incurred. The attorney testified that the amount of work performed was driven by the number and nature of Mother's allegations against Father and the need to protect the best interest of the child. The attorney also testified that Mother's initial attorney did not provide documents timely, and when documents were produced, they included "embedded information" and required extra work to read, understand, and prepare for trial. On cross-examination, the attorney testified that his fees were "in the top 3 percent[]" but were appropriate for his level of experience, particularly with large family law cases.

In its Findings of Fact, the trial court noted that Mother's initial attorney was unable to comply with court deadlines, which required multiple trial resets, and that Mother's unsubstantiated and serious allegations against Father caused Father to incur a significant amount of reasonable and necessary attorney's fees to protect himself and the child. The trial court also found that Father incurred $247,056.50 in reasonable and necessary attorney's fees to preserve and protect the rights of the child.

At trial, Father's attorney testified about his own background and qualifications, but he provided very little information about the other employees who worked on the case. Without such information, "a factfinder has no meaningful way to determine whether an attorney's fee request is (or is not) reasonable and necessary for the services rendered." *L&W Supply Corp. v. Kizziah*, No. 09-20-00198-CV, 2022 Tex. App. LEXIS 8781, at *21 (Tex. App.—Beaumont Dec. 1, 2022, no pet.) (mem. op.).

"A reasonable attorney's fee is one that is not excessive or extreme, but rather moderate or fair." *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010). Father's attorney admitted that his fees were in "the top 3 percent[]" for what is customarily charged in the area. Although the attorney's testimony was uncontroverted, we find that the evidence falls short of establishing that the hourly rates charged by Father's attorney and his staff were "not excessive or extreme"; were "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation"; and reflected the reasonable, "prevailing market rate." *See Blum*, 465 U.S. at 895 n.11; *Garcia*, 319 S.W.3d at 642; *Rohrmoos Venture*, 578 S.W.3d at 491, 494. Therefore, we remand to the trial court for a determination of "reasonable attorney's fees"—including the rates for the attorney's staff—under the appropriate standard. *See Sullivan v. Abraham*, 488 S.W.3d 294, 300 (Tex. 2016). We sustain Mother's second issue.

47

In summary, we overrule Mother's first issue, and we sustain Mother's second issue. We affirm the trial court's Order in Suit to Modify Parent-Child Relationship except as to attorney's fees, and we remand the matter to the trial court for further proceedings on attorney's fees consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

LEANNE JOHNSON
Justice

Submitted on December 4, 2024
Opinion Delivered April 24, 2025

Before Johnson, Wright and Chambers, JJ.